Patrick F. McGROGAN and Barbara A. McGrogan, on behalf of themselves and all others similarly situated, Appellants

v.

**FIRST COMMONWEALTH BANK, f/k/a National Bank of the Commonwealth, Appellee.**

Patrick F. McGrogan and Barbara A. McGrogan, on behalf of themselves and all others similarly situated, Appellees

v.

**First Commonwealth Bank, f/k/a National Bank of the Commonwealth, Appellant.**

Superior Court of Pennsylvania.

Argued May 7, 2013.

Filed Aug. 27, 2013.

Frank G. Salpieto, Pittsburgh, for McGrogan.

Gary P. Hunt, Pittsburgh, for First Commonwealth.

BEFORE: BENDER, GANTMAN and OLSON, JJ.

OPINION BY OLSON, J.:

In this consolidated appeal and cross-appeal, Appellants/Cross–Appellees, Patrick F. McGrogan and Barbara A. McGrogan, on behalf of themselves and all others similarly situated, appeal from the order entered on August 30, 2012, denying their motion for partial summary judgment and

granting the motion for summary judgment filed on behalf of Appellee/Cross–Appellant First Commonwealth Bank, f/k/a National Bank of the Commonwealth (hereinafter "the Bank"). In granting the Bank's motion for summary judgment, the trial court dismissed the sole claim that it previously certified for class treatment. The Bank has also filed a cross-appeal from the same order. We affirm the trial court's order to the extent it denied class certification to Appellants' "fraud in the execution" claim (Count 1) and "violation of the Unfair Trade Practices and Consumer Protection Law" claim (Count 5).[1] We quash the Bank's appeal at docket number 1490 WDA 2012.

Appellants instituted the current class action on January 12, 2009 and, on July 20, 2009, Appellants filed their Amended Class Action Complaint (hereinafter "Appellants' Complaint"). Within the complaint, the named Appellants—Patrick F. McGrogan and Barbara A. McGrogan—averred the following.[2]

In March 1983, executives of the Bank approached Mr. McGrogan and informed Mr. McGrogan that the Bank was offering a variety of Individual Retirement Account ("IRA") investment products. Appellants' Complaint, 7/20/09, at ¶ 21. One of these products was named the "IRA Market Rate Savings Account." According to the McGrogans, the Bank executives orally promised Mr. McGrogan that: 1) the IRA Market Rate Savings Account "was designed to be a long-term investment vehicle with a rate that could fluctuate weekly and thus yield [a return that was] higher than 8%, but that would nonetheless guar-antee a minimum 8% return for as long as [Mr. McGrogan] decided to keep his money in that account;" 2) although the account matured after 90 days, "[t]he 90–day maturity on the account was for [Mr. McGrogan's] benefit, since it gave him the flexibility of moving some or all of his retirement money to another investment vehicle every 90 days if he felt he could get a better rate;" and, 3) "[s]o long as [Mr. McGrogan] did not take action to move the funds or close the account, the IRA Market Rate Savings Account would automatically continue, roll over or renew at a rate that would never fall below 8%, and the Bank would continue to invest the funds in such an account." Id. at ¶ 22. As a result of these oral promises, Mr. McGrogan agreed to open an IRA Market Rate Savings Account with the Bank. Id. at ¶ 23. Further, and while the McGrogans do not specify what promises were personally made to Mrs. McGrogan, the McGrogans aver:

> Barbara McGrogan opened an 'IRA Market Rate Savings Account' in March 1984 and consistent with the promises made to her and, earlier, to her husband, Mrs. McGrogan earned the greater of the Bank's market rate ... or the guaranteed minimum rate of 8%, as promised.

Id. at ¶ 24.

To establish their IRAs, the McGrogans signed separate, but substantively identical, written contracts, which are entitled "Individual Retirement Custodial Account (Under Section 408(a) of the Internal Revenue Code)" (hereinafter "Custodial Agreement").[3] Mr. McGrogan's Custodial

---

**1.** As will be discussed below, we do not have jurisdiction to consider the remainder of Appellants' claims.

**2.** Within this opinion, we identify "Appellants" to be the McGrogans and the class members; when we refer to "the McGro-gans," we are speaking only of the individual, named representatives.

**3.** The parties used the pre-approved IRS Model Form 5305–A (revised December 1981) to create their Custodial Agreements.

Agreement begins by providing: [4]

The Depositor [5] whose name appears above is establishing an individual retirement account (under section 408(a) of the Internal Revenue Code) to provide for his or her retirement and for the support of his or her beneficiaries after death.

The Custodian [6] named above has given the Depositor the [D]isclosure [S]tatement required under the Income Tax Regulations under section 408(i) of the Code.

The Depositor has deposited with the Custodian [$3,449.69] in cash.

Mr. McGrogan's Custodial Agreement, dated 1/26/84, at 1.

Mr. McGrogan's Custodial Agreement then recites a number of "Articles," setting forth the terms of his relationship with the Bank. For example, the Articles: specify the yearly maximum dollar amount that Mr. McGrogan was permitted to contribute to his IRA; declare that Mr. McGrogan's interest in the balance in his account was nonforfeitable; state that no part of the funds would be invested in life insurance contracts; provide that the assets would not be commingled with other property "except in a common trust fund or common investment fund;" and, establish a system for distributing the account assets. *Id.* at 1–2; *see also* 26 U.S.C. § 408(a).

Article VIII of the Custodial Agreement specifically allowed for amendment of the contract. The article declares:

### Article VIII

This agreement will be amended from time to time to comply with the provisions of the [Internal Revenue] Code

and related regulations. Other amendments may be made with the consent of the persons whose signatures appear below.

Note. [Article IX] may be used for any other provisions you wish to add....

Mr. McGrogan's Custodial Agreement, dated 1/26/84, at 2.

The parties signed the bottom of the form agreement and attached a separate, signed page to the contract. The attachment is entitled "Attachment to Individual Retirement Account Article IX" and provides, in relevant part:

1. Contributions shall be invested, at the direction of the Depositor, in such time deposits or savings accounts as are, from time to time, offered by the Custodian Bank for IRA accounts. The Custodian is under no duty to compel the Depositor to make any contribution to the Individual Retirement Account (the Account) or to verify the accuracy of any contribution. A minimum contribution may be required by the Custodian.

Proceeds of maturities shall be invested, at the direction of the Depositor in such time deposits or savings accounts, as are from time to time, offered by the Custodian Bank. In absence of such direction, the proceeds will be invested in a like investment by the Custodian Bank.

2. Custodian may resign upon 60 days['] notice to the Depositor. Custodian, upon resignation, shall transfer the assets of the Account in such manner as the Depositor may specify in writing. If Depositor fails to appoint a successor Custodian within 60 days after the Custodian's notice of resignation, Custodian

---

4. Since Mr. McGrogan's and Mrs. McGrogan's Custodial Agreements are substantively identical, we will quote from only one of the contracts.

5. "The Depositor" is identified as Mr. McGrogan.

6. "The Custodian" is identified as the Bank.

may appoint a successor Custodian to hold the assets of the account.

*Id.* at Attached Page 3.

In accordance with Treasury Regulation § 1.408–6, the Bank (as the Custodian of the IRA) was required to provide the McGrogans with both a copy of the "governing instrument [that was] used in establishing the [IRA]" and a "Disclosure Statement." [7] 26 C.F.R. § 1.408–6(a)(1) and (d)(4)(i); *see also* 26 U.S.C. § 408(i). The McGrogans admit that they received the required Disclosure Statements. Indeed, as quoted above, the second full paragraph of Mr. McGrogan's Custodial Agreement expressly references the Disclosure Statement and declares that Mr. McGrogan received the Disclosure Statement prior to signing the Custodial Agreement. The relevant paragraph declares: "[t]he Custodian named above has given the Depositor the [D]isclosure [S]tatement required under the Income Tax Regulations under section 408(i) of the Code." [8] *See* Mr. McGrogan's Custodial Agreement, dated 1/26/84, at 1; Mrs. McGrogan's Custodial Agreement, dated 3/19/84, at 1.

The McGrogans' Disclosure Statements contain the requisite explanations and other matters that Treasury Regulation § 1.408–6(d)(4) demands.[9] However, the Disclosure Statements also contain certain "additional information." *See* 26 C.F.R.

§ 1.408–6(d)(4)(viii). In particular, "Article VI" of the Disclosure Statements (entitled "Investment Opportunities") lists a number of different investment vehicles that the Bank was then offering its IRA customers. *See* Mr. McGrogan's Disclosure Statement, at 3–5; Mrs. McGrogan's Disclosure Statement, at 3–5. One of the listed investment vehicles was the IRA Market Rate Savings Account. Article VI of the Disclosure Statements defined the IRA Market Rate Savings Account as follows:

1. IRA Market Rate Savings Account—This account offers a 90[-]day decreasing term with the entire account maturing 90 days from the date of the original deposit. This account permits additional deposits to be added to the account any time during its 90[-]day term. All deposits to the account mature 90 days from the date of the original deposit. The rate payable on the account changes weekly, in line with market conditions. The rate is established each week by the Bank's Steering committee, equal to 90% of the rate being offered on the Bank's 182 day to 364 day money maker certificates. The IRA Market Rate Savings Account carries a guaranteed minimum rate of 8%. A minimum $50.00 deposit is required.

. . .

7. Treasury Regulation § 1.408–6(d)(4) lists the required contents of any Disclosure Statement. The regulation demands that a Disclosure Statement "set forth in nontechnical language" a variety of matters, such as: an explanation of the "requirements ... that pertain to the particular retirement savings arrangement;" the income tax consequences of establishing the account; and, the circumstances under which the benefited individual may revoke the account. *See* 26 C.F.R. § 1.408–6(d)(4)(iii)—(vii). Further, the regulation permits "additional information" to be included in the Disclosure Statement. Specifically, Regulation § 1.408–6(d)(4)(viii) de-

clares: "[a] [D]isclosure [S]tatement, or an amendment thereto, furnished pursuant to the provisions of this subparagraph may contain information in addition to that required by paragraph (d)(4)(iii) through (vii) of this section." 26 C.F.R. § 1.408–6(d)(4)(viii).

8. Again, since Mr. and Mrs. McGrogan's Custodial Agreements are substantively identical, we quote from only one of the agreements.

9. The relevant portions of the McGrogans' Disclosure Statements are identical to one another.

If an account of this type is redeemed prior to maturity, you will forfeit an amount equal to 1 month of interest calculated on the basis of the interest rate in effect [at] the time the certificate is redeemed....

Mr. McGrogan's Disclosure Statement, at 3–4; Mrs. McGrogan's Disclosure Statement, at 3.

Importantly, the above language does not declare that the account would be "automatically continued" or "rolled over" after the 90–day term. Rather, the paragraph states that the IRA Market Rate Savings Account is a "90[-]day decreasing term with the entire account maturing 90 days from the date of the original deposit.... All deposits to the account mature 90 days from the date of the original deposit." Mr. McGrogan's Disclosure Statement, at 3–4; Mrs. McGrogan's Disclosure Statement, at 3; *see also* Mr. McGrogan's Custodial Agreement, dated 1/26/84, at Attached Page 3 ("[p]roceeds of maturities shall be invested, at the direction of the Depositor in such time deposits or savings accounts, as are from time to time, offered by the Custodian Bank"); Mrs. McGrogan's Custodial Agreement, dated 3/19/84, at Attached Page 3 (same).

As the McGrogans aver, from the time they opened their IRA Market Rate Savings Accounts until the fall of 2008, the Bank paid them a minimum interest rate of 8% and, after each 90–day maturation period, the Bank "automatically continued, renewed/rolled over the[ir] IRA Market Rate Savings Accounts." Appellants' Complaint, 7/20/09, at ¶ 24 and 27–28. The McGrogans also aver that, in 1998, the Bank "threatened to unilaterally reduce the guaranteed rate of the IRA Market Rate Savings Account from 8% to 4.6%."

*Id.* at ¶ 28. However, on June 3, 1998, the Bank retreated from its attempt and sent the McGrogans letters, "stating that the minimum 8% rate would be paid 'retroactively to [their] most recent maturity date and will continue going forward on deposits presently in the account and on annual additions.' " *Id.*

In·the fall of 2008, the Bank sent the McGrogans letters, notifying the McGrogans that the Bank was "exercising [its] right to resign as Custodian for" the IRAs. The letter addressed to Mr. McGrogan declared: [10]

With this writing[, the Bank] is exercising the right to resign as Custodian for this account in accordance with the disclosure provided at account opening. This letter serves as your official notice that upon the *Maturity Date* of December 26, 2008, reflected on the enclosed notice you will receive a total disbursement from [the Bank] of the current IRA balance, including principal and interest.

[The Bank] would appreciate the opportunity to continue to serve as your first choice for any retirement investment needs. Currently, we are pleased to offer a Variable Rate Savings IRA with a 3.50% APY. A number of Certificates of Deposit with current market rates are also available....

Because this is a Qualified Retirement Account, [the Bank] believes both the principal and the earnings on that principal represent a return of "tax-deferred" dollars to you, the investor. Therefore, we highly recommend that you consult with your tax advisor or your financial advisor regarding the issues surrounding premature withdrawal

---

10. Except for the specific "maturity date," the Bank's notification to Mrs. McGrogan contains language that is identical to that which

is contained in the notification to Mr. McGrogan.

or transfer of money held in a qualified account. Many account holders receiving this letter may need to consider making a "custodian-to-custodian" transfer into another qualified account to avoid potential current year tax consequences or possible IRS penalties for early withdrawal.

We are here to help in your decision-making to find the proper investment vehicle for your upcoming IRA disbursement. . . .

Letter from the Bank to Mr. McGrogan, dated 10/8/08, at 1 (emphasis in original); *see also* Letter from the Bank to Mrs. McGrogan, dated 9/10/08, at 1.

Following the Bank's resignation, the McGrogans initiated the current lawsuit. As the McGrogans claimed, the Bank had specifically promised them that the IRA Market Rate Savings Account "would automatically continue, roll over or renew at a rate that would never fall below 8%"—and that the automatic rollover would continue for so long "as [the McGrogans] did not take action to move the funds or close the account." Appellants' Complaint, 7/20/09, at ¶ 22. Further, the McGrogans claimed that the Bank had made similar promises to hundreds of other people. According to the McGrogans, when the Bank resigned as Custodian over the accounts and marked the accounts closed, the Bank breached its contractual obligations to the McGrogans and to all of the then-existing IRA Market Rate Savings Account holders. Thus, the McGrogans filed a complaint on behalf of themselves and all other similarly situated individuals. The McGro-

gans sought to represent the following class:

> All persons who established an [IRA] with [the Bank] for his or her retirement and for the support of his or her beneficiaries after death, who (a) opened an IRA Market Rate Savings Account at the Bank, and (b) received letters, beginning in or around the middle part of 2008 and continuing thereafter, which are identical or substantially similar to [the October 8, 2008 resignation letter that the Bank sent to Mr. McGrogan].

*Id.* at ¶ 104.[11]

The class action complaint contained eight counts:[12]

> 1) Count 1: fraud in the execution (claiming: that—when the Bank drafted the contract that created the IRA Market Rate Savings Accounts—the Bank fraudulently omitted the promised term that "the IRA Market Rate Savings Account would automatically continue, roll over or renew at a rate that would never fall below 8%, and the Bank would continue to invest the funds in such an account;" that the class members "rel[ied] upon the Bank's representations;" and, "[t]o the extent the Bank now denies the effectiveness of the relevant terms ... the Bank has committed fraud in the execution of those agreements");

> Count 2: promissory estoppel (claiming the Bank should have reasonably expected that its promises would have induced its customers to either deposit or keep their funds in an IRA Market Rate Savings Account);

---

**11.** According to the McGrogans, their proposed class consisted of "at least 300 persons located in various parts of the Commonwealth." Appellants' Complaint, 7/20/09, at ¶ 104.

**12.** For ease of reading and recognition, we have indented and separately paragraphed this portion of the opinion. Further, in reciting Appellants' claims, we have included only those claims that are relevant to the current appeal.

3) Count 3: breach of contract: modification (claiming that—when the Bank sent the June 3, 1998 letter and informed its IRA Market Rate Savings Account holders that "the minimum 8% rate would be paid 'retroactively to your most recent maturity date and will continue going forward on deposits presently in the account and on annual additions' "—the Bank modified the original agreement and eliminated the "90–day maturity" term as to the accounts);

4) Count 4: breach of fiduciary duty (claiming the Bank breached its fiduciary duty by: a) "deliberately taking action which destroyed, or threatened to destroy, the tax-deferred status of [the] IRA Market Rate Savings Account;" b) unilaterally closing the accounts; c) sending its customers threatening and confusing letters; d) withholding or threatening to withhold portions of the IRA account; e) reporting or threatening to report a taxable distribution to the IRS; and, f) withdrawing as Custodian of the accounts);

5) Count 5: violation of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (claiming the Bank engaged in unfair and deceptive trade practices by "representing that its IRA Market Rate Savings Accounts would have characteristics and benefits which the Bank now claims they did not have" and by sending "frighten[ing], confus[ing,] and mislead[ing]" resignation letters);

6) Count 6: breach of contract (claiming the Bank breached its contract by failing to "automatically continue, roll over or renew [the IRA Market Rate Savings Accounts] at a rate that would never fall below 8%" and by "attempting . . . to terminate the [contracts] . . . simply by withdrawing as custodian");

7) Count 7: breach of contract (claiming the Bank breached the contract by: "cash[ing] out" of the accounts; acting in its own self-interest; acting in violation of its duties of good faith and fair dealing; and, forcing its customers to "take a lump sum distribution of the balance of [the] account before the time set forth"); and,

8) Count 8: declaratory relief (claiming that the trial court should "declare that the [c]lass [m]embers are entitled to maintain an IRA Market Rate Savings Account which carries a guaranteed minimum rate of 8% notwithstanding the purported withdrawal of the Bank as a custodian, and that the Bank must specifically perform this obligation").

Appellants' Complaint, 7/20/09, at ¶¶ 43–102.

The Bank filed preliminary objections in the nature of a demurrer to every count in the complaint. *See* Pa.R.C.P. 1705 (preliminary objections to a class action complaint). On November 20, 2009, the trial court issued a memorandum and order of court, sustaining in part and overruling in part the Bank's preliminary objections.

First, the trial court explained, Appellants were precluded from introducing parol evidence to support their breach of contract claims, as the Custodial Agreement and Disclosure Statement constituted "a comprehensive writing that fully set[ ] forth the rights and obligations of the Bank and the account owner." Trial Court Opinion, 11/20/09, at 2. Thus, to the extent Appellants' breach of contract claims were dependent upon extra-contractual, oral representations, made to the customer at the time of the initial deposit—such as Appellants' claim that the Bank promised "the IRA Market Rate Savings Account would automatically continue, roll over or renew at a rate that would never fall below 8%, and the Bank would continue to invest

the funds in such an account"—the claims failed as a matter of law. *Id.* at 8; *see also* Trial Court Opinion, 7/7/09, at 5–6. Further, since the Bank was expressly permitted to resign as Custodian, the trial court completely dismissed two of Appellants' breach of contract claims (Counts 6 and 7). Trial Court Opinion, 11/20/09, at 2.

The trial court dismissed Appellants' breach of fiduciary duty claim (Count 4) because the Bank was permitted to resign as Custodian and because Appellants did not aver that they suffered any adverse tax consequences when the Bank resigned as Custodian and closed the accounts. *Id.* at 7.

Next, the trial court dismissed the portion of Appellants' UTPCPL claim (Count 5) that was based upon the Bank's extra-contractual promises and the Bank's resignation as Custodian. *Id.*

Finally, the trial court dismissed Appellants' promissory estoppel claim (Count 2), as "it is undisputed that the relationship between [Appellants] and the Bank is governed by a contractual agreement (the only dispute is over the terms and conditions of the agreement)." *Id.* at 5.

However, the trial court overruled the Bank's demurrers to: the "fraud in the execution" claim (Count 1); the "breach of contract: modification" claim (Count 3); and, the portion of the "violation of the UTPCPL" claim that was "based [upon] allegations that would support a finding for fraud in the execution" (Count 5). *Id.* at 3–8.

With respect to the fraud in the execution claim, the trial court explained: "[Appellants claim] fraud in the execution because the writings setting forth the obligations of the Bank (*i.e.*, the Individual Retirement Account Disclosure Statements) fraudulently omitted a provision guaranteeing an 8% minimum return until

the accounts were closed." *Id.* at 3. As the trial court held, pursuant to *Toy v. Metropolitan Life Insurance Co.*, Appellants had properly pleaded a fraud in the execution claim. *Toy v. Metro. Life Ins. Co.*, 593 Pa. 20, 928 A.2d 186, 206–207 (2007) (holding: "the parol evidence rule is not applied to a fraud in the execution of a contract claim"); Trial Court Opinion, 11/20/09, at 3–5. Further, and for this same reason, the trial court held that Appellants "may pursue claims [for violation of the UTPCPL] based [upon] allegations that would support a finding for fraud in the execution." Trial Court Opinion, 11/20/09, at 7.

Appellants' "breach of contract: modification" claim was based upon the Bank's June 3, 1998 letter to the IRA Market Rate Savings Account holders. Within the June 3, 1998 letter, the Bank informed its customers that "the minimum 8% rate would be paid 'retroactively to your most recent maturity date and will continue going forward on deposits presently in the account and on annual additions.'" Appellants' Complaint, 7/20/09, at ¶¶ 68–70. According to the trial court:

As a result of this letter, the Bank was obligated to reestablish the rate on each account to 8% retroactive to the most recent maturity date. Furthermore, it is [Appellants'] position that through this writing the Bank had promised to pay the 8% rate going forward until the depositor closes the account. The merits of this claim will depend on whether it was reasonable for the recipient of the letter to read the letter in this fashion. This is a question to be decided by a fact finder. Consequently, the preliminary objections seeking dismissal of this count are overruled.

Trial Court Opinion, 11/20/09, at 6–7.

Following the trial court's ruling, the Bank answered the complaint and discov-

ery relating to the class certification issues commenced.

On January 18, 2011, Appellants filed a motion for class certification and, on July 27, 2011, the trial court entered an order granting in part and denying in part Appellant's motion for class certification. As the trial court ruled, it denied class certification as to the "fraud in the execution" (Count 1) and "violation of the UTPCPL" (Count 5) claims because there were three significant issues of law and fact that were uncommon to the class. In particular, the trial court concluded: 1) "not all persons who purchased the IRA Market Rate Savings Accounts will testify that the bank officials told them that the 8% interest rate was guaranteed;" 2) "even customers who testify they were promised 8% interest do not describe the same guarantee;" and, 3) the mandatory element of "reliance" would necessarily "vary from person to person." Trial Court Opinion, 7/27/11, at 2–3.

However, the trial court declared that it was granting class certification to the "breach of contract: modification" claim (Count 3). As noted above, this claim was based upon the Bank's June 3, 1998 letter, wherein the Bank stated that the minimum 8% rate would be paid "retroactively to [the account holder's] most recent maturity date and will continue going forward on deposits presently in the account and on annual additions." Appellants' Complaint, 7/20/09, at ¶¶ 68–70. According to the trial court, the statements in the June 3, 1998 letter created a factual issue as to whether the Bank modified the original contract. Specifically, the trial court reasoned, the letter might have eliminated the "90–day maturity" provisions in the original contract and modified the contract to read that the Bank was "promising to pay 8% for money presently in the account and on annual additions until the account is closed." Trial Court Opinion, 7/27/11, at

5–6. Thus, the trial court certified the following class:

All persons who (a) opened a product sometimes known as an "IRA Market Rate Savings Account" at [the Bank]; (b) received the June 3, 1998 letter; (c) as of June 1, 2008, maintained funds in said "IRA Market Rate Savings Account;" and (d) after June 1, 2008, received one or more letters from the Bank purporting to exercise the Bank's right to resign as custodian or to otherwise close the "IRA Market Rate Savings Account."

Trial Court Order, 7/27/11, at 1–2.

Thereafter, Appellants filed a "Motion to Approve Proposed Class Notice," wherein Appellants sought court approval of their proposed opt-out class notice. By order entered on October 3, 2011, the trial court approved Appellants' proposed class notice and ordered that Appellants file a report "[w]ithin [14] days of the deadline for postmarking 'Opt–Out Requests' ..., identifying the [c]lass [m]embers who elect[ed] to opt-out of this matter." Trial Court Order, 10/3/11, at 1. Appellants filed their report on November 23, 2011 and identified the nine individuals who elected to opt-out of the class. Appellants' Report, 11/23/11, at 1–2.

On December 19, 2011, Appellants filed a motion for partial summary judgment and sought judgment, in their favor, on the issue of the Bank's liability. According to Appellants, the Bank's June 3, 1998 letter unambiguously modified the original contract. Appellants' Motion for Partial Summary Judgment, 12/19/11, at 2–3. Thus, Appellants claimed, when the Bank resigned as Custodian and closed the accounts, the Bank breached the relevant contracts as a matter of law. *Id.* at 3. Appellants requested that the trial court "enter a judgment of liability in favor of the [c]lass [m]embers and against the

Bank, with the issue of damages to be determined [by] a jury." *Id.* at 4.

The Bank filed a cross-motion for summary judgment on February 7, 2012 and argued that Appellants' "breach of contract: modification" claim (Count 3) must be dismissed as a matter of law. According to the Bank, "even if the [June 3,] 1998 letter constituted a modification [of the original agreement, the purported modification] did not strip the Bank of [its] right to resign [as Custodian of the accounts]." The Bank's Motion for Summary Judgment, 2/7/12, at 4. As the Bank argued, since it simply exercised its contractual right to resign as Custodian over the accounts, Appellants' "breach of contract: modification" claim failed as a matter of law and Count 3 of Appellants' complaint must be dismissed in its entirety. *Id.* at 4–5.

The trial court heard oral argument on the summary judgment motions and, on August 30, 2012, the trial court issued an order: denying Appellants' motion for partial summary judgment, granting the Bank's motion for summary judgment, and dismissing, with prejudice, the entirety of Appellants' "breach of contract: modification" claim. Trial Court Order, 8/30/12, at 1. Within its contemporaneously filed opinion, the trial court concluded:

> The Bank correctly states that there is no language in the June 3, 1998 letter which provides that the Bank is waiving its right to resign contained within the [Custodial Agreement]. Furthermore, the June 3, 1998 letter does not include any language that is inconsistent with the Bank exercising its contractual right to resign.
>
> From the date that the account of each member of the class was opened, the Bank has had a right to resign as custo-

dian upon [60 days'] notice. This right was not related to the term of the IRA. The June 3, 1998 letter does not expressly guarantee an eight percent return until the depositor closes the account. Consequently, the provisions of the letter do not modify the rights of the Bank to resign as custodian.

> Furthermore, if there is ambiguity as to whether the Bank intended for the June 3, 1998 letter to modify its right to resign as custodian, the Bank will prevail ... because the burden rests on the party claiming modification to show that the parties entered into a new agreement modifying provisions of the prior agreement and [Appellants] have not met their burden.

Trial Court Opinion, 8/30/12, at 9–10.

We note that, although the trial court's August 30, 2012 order dismissed Appellants' "breach of contract: modification" claim in its entirety, the order did not concern itself with the McGrogans' two individual, surviving claims: the "fraud in the execution" claim (Count 1) or the portion of the "violation of the UTPCPL" claim that was "based [upon] allegations that would support a finding for fraud in the execution" (Count 5). *See* Trial Court Opinion, 8/30/12, at 5 ("[f]or purposes of deciding the motions for summary judgment, [the trial court is] addressing only Count [3]—Breach of Contract: Modification"). Certainly, within the Bank's motion for summary judgment, the Bank did not even move to have the individual claims dismissed. *See* The Bank's Motion for Summary Judgment, 2/7/12, at 1–5.

On September 4, 2012, Appellants filed a notice of appeal from the August 30, 2012 order and, on September 27, 2012, the Bank filed a cross-appeal. Appellants raise the following issues: [13]

---

**13.** The trial court ordered Appellants to file

and serve a concise statement of errors com-

1. Whether the [trial] court rendered the Bank's promises regarding the term and rates of retirement Investment Contracts virtually illusory and meaningless, by ruling that the Bank's purported 60–day "right" to resign as custodian under an IRA Custodial Contract effectively relieved the Bank of any further liability under the separate Investment Contracts, allowed the Bank to terminate the investments, and/or converted any separate Investment Contract into a 60–day instrument, regardless of the Bank's promised duration, admissions or contrary conduct[?]

2. Whether the [trial] court should have allowed conduct, representations and admissions of the Bank, spanning more than 25 years, to be considered in determining whether the Bank breached non-integrated IRA Custodial and Investment Contracts, subsequently modified those contracts and/or is deemed to have waived terms of those contracts[?]

3. Whether the [trial] court failed to properly apply the *contra proferentem* doctrine to an IRA Custodial Contract, the separate retirement Investment Contracts, and written modifications, all drafted by the Bank and sold to "small saver" consumers[?]

4. Whether the [trial] court failed to consider the existence and full extent of a bank's fiduciary duty as an IRA trustee in deciding class certification for fraud in the execution and deceptive trade practices, improperly limited the scope of the Bank's obligations as a custodial trustee, and erred in ruling that the [c]lass [r]epresentatives did not have "standing" to assert a fiduciary duty

claim (even though there is no dispute the Bank was a custodian of their IRA investments)[?]

5. Whether the [trial] court erred in granting summary judgment for the Bank, and refusing summary judgment to the [c]lass, by ruling that the Bank did not intend to modify its rights relating to IRA Custodial and Investment Contracts when the issue of intent was in dispute, the Bank's conduct and admissions evidenced an intent to modify and/or waive rights, and when, in any event, questions of intent are within the exclusive province of a jury[?]

6. Whether the [trial] court should have allowed a jury to determine whether the Bank committed unfair, fraudulent or deceptive trade practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law[?]

Appellants' Brief at 5–6.

The Bank raises two claims in its cross-appeal: [14]

1. Whether [Appellants' Complaint] alleged facts sufficient to state claims for fraud and violation of the UTPCPL on a theory of fraud in the execution[?]

Whether Count [3 of Appellants' Complaint] should have been certified as a class action where Appellants failed to establish that the 1998 letter met the formal requisites of contract formation[?]

The Bank's Brief at 3.

As we have explained, prior to reaching the merits of any appeal, this Court must "first ascertain whether the [order appealed from] is properly appealable." *Com-*

---

plained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). Appellants complied and, within their Rule 1925(b) statement, Appellants listed the claims that they currently raise on appeal.

14. The trial court did not order the Bank to file a Rule 1925(b) statement.

*monwealth v. Borrero,* 692 A.2d 158, 159 (Pa.Super.1997). Indeed, since "the question of appealability implicates the jurisdiction of this Court[, the issue] may be raised by [this] Court *sua sponte.*" *Commonwealth v. Baio,* 898 A.2d 1095, 1098 (Pa.Super.2006).

Generally, this Court's jurisdiction "extends only to review of final orders." *Rae v. Pa. Funeral Dir's Ass'n,* 602 Pa. 65, 977 A.2d 1121, 1124–1125 (2009); 42 Pa.C.S.A. § 742; Pa.R.A.P. 341(a). A final order is defined as any order that: "(1) disposes of all claims and of all parties; [ ](2) is explicitly defined as a final order by statute; or (3) is entered as a final order pursuant to [Pennsylvania Rule of Appellate Procedure 341(c) ]." Pa.R.A.P. 341(b).

■ In the case at bar—and contrary to the representations of Appellants and the Bank—the trial court's August 30, 2012 order does not constitute a final order. First, the August 30, 2012 order did not "dispose[ ] of all claims and of all parties."

Pa.R.A.P. 341(b)(1). Certainly, the trial court never dismissed the McGrogans' individual claims for "fraud in the execution" (Count 1) or "violation of the UTPCPL" (Count 5) and the McGrogans have not discontinued those claims. Thus, since the McGrogans are still parties to this action and since two of the McGrogans' individual claims remain viable and ongoing, the August 30, 2012 order is not appealable under Rule 341(b)(1), as the order did not "dispose[ ] of all claims and of all parties." Pa.R.A.P. 341(b)(1); *see also* Pa.R.A.P. 341 cmt. ("[t]he 1992 amendments [to Rule 341] generally eliminates appeals as of right under Rule 341 from orders not ending the litigation as to all claims and as to all parties.... The following is a partial list of orders that are no longer appealable as final orders pursuant to Rule 341 but which, in an appropriate case, might fall under Rules 312 ... or 313 ... of this Chapter[:] ... (7) an order denying class certification in a class action case").[15]

---

**15.** It is possible that the parties mistakenly believed that the August 30, 2012 order was a final order because of the explanatory comment to Pennsylvania Rule of Civil Procedure 1710. Rule 1710 is entitled "Order Certifying or Refusing to Certify a Class Action[;] Revocation[;] Amendment[;] Findings and Conclusions." In relevant part, the comment to Rule 1710 declares:

> Subdivision (a) of Rule 1710 requires the [trial] court to file an opinion accompanying an order of [class] certification or an order refusing to certify or an order of revocation of a previous order of [class] certification. The opinion must set forth the basis for [the] decision, including findings of fact, conclusions of law and appropriate discussion of the matters specified in Rules 1702, 1708 and 1709. **Findings and conclusions are essential because an order refusing to certify or revoking a previous certification is a final appealable order.**

Pa.R.C.P. 1710 cmt. (emphasis added).

This comment was adopted in 1977 and it has not been amended since that date. Therefore, when the comment was written, it was the law in this Commonwealth that "orders not

ending the litigation as to all claims and all parties [were considered to be] final orders [where the] orders [had] the practical consequence of putting [the] litigant out of court." Pa.R.A.P. 341 cmt. Further, in construing this (now abrogated) rule of finality, our Supreme Court held: "[a]n order dismissing the class aspects of a suit puts the class members out of court, is a final order for those parties[,] and is therefore appealable." *Bell v. Beneficial Consumer Disc. Co.,* 465 Pa. 225, 348 A.2d 734, 736 (1975).

In 1992, however, our Supreme Court amended Pennsylvania Rule of Appellate Procedure 341 and made it clear that, generally, "an order is not final and appealable unless it 'disposes of all claims and all parties.'" *Niemiec v. Allstate Ins. Co.,* 721 A.2d 807, 809 (Pa.Super.1998), *quoting* Pa.R.A.P. 341(b)(1). The 1977 comment to Rule 1710 neither reflects nor contemplates the amendments to Rule 341 and, to the extent Rule 1710's comment is inconsistent with Rule 341, the comment is legally incorrect. We do note that, although explanatory comments are not legally binding, the presence of this comment does have the potential to mislead litigants.

Further, while the August 30, 2012 order dismissed the one claim that the trial court had previously certified for class treatment—and while the July 27, 2011 order denied class certification for the "fraud in the execution" and "violation of the UTPCPL" claims—neither an order dismissing class action claims nor an order denying class certification is "defined as a final order by statute." Pa.R.A.P. 341(b)(2). Finally, the August 30, 2012 order was not "entered as a final order pursuant to [Pa.R.A.P. 341(c) ]." Pa.R.A.P. 341(b)(3) (final order involving less than all claims and all parties where the trial court expressly determines that an immediate appeal would facilitate resolution of the entire case).

Therefore, since the trial court's August 30, 2012 order does not fall under any of the three definitions of a "final order," the order is not appealable under Rule 341. The order is thus non-final and interlocutory.

■ Interlocutory orders are appealable in certain circumstances. As our Supreme Court has explained:

in addition to an appeal from final orders of the Court of Common Pleas, our rules provide the Superior Court with jurisdiction in the following situations: interlocutory appeals that may be taken as of right, Pa.R.A.P. 311; interlocutory appeals that may be taken by permission, Pa.R.A.P. [312]; appeals that may be taken from a collateral order, Pa. R.A.P. 313; and appeals that may be taken from certain distribution orders by the Orphans' Court Division, Pa. R.A.P. 342.

*Commonwealth v. Garcia,* 615 Pa. 435, 43 A.3d 470, 478 n. 7 (2012) (internal quotations omitted), *quoting McCutcheon v. Phila. Elec. Co.,* 567 Pa. 470, 788 A.2d 345, 349 n. 6 (2002).

Here, the trial court's August 30, 2012 order is not appealable as of right (*per* Pa.R.A.P. 311) and neither party asked for or received permission to appeal the August 30, 2012 order (*per* Pa.R.A.P. 312). Thus, the question before this Court is whether any of the interlocutory orders in this case (or any aspect of those orders) are appealable under the collateral order doctrine. *See* Pa.R.A.P. 313.[16]

Pennsylvania Rule of Appellate Procedure 313 defines a collateral order as one that: "1) is separable from and collateral to the main cause of action; 2) involves a right too important to be denied review; and 3) presents a question that, if review is postponed until final judgment in the case, the claim will be irreparably lost." *In re Bridgeport Fire Litigation,* 51 A.3d 224, 230 n. 8 (Pa.Super.2012); Pa.R.A.P. 313(b). Our Supreme Court has emphasized:

the collateral order doctrine is a specialized, practical [exception to] the general rule that only final orders are appealable as of right. Thus, Rule 313 must be interpreted narrowly, and the requirements for an appealable collateral order remain stringent in order to prevent undue corrosion of the final order rule. To that end, each prong of the collateral order doctrine must be clearly present before an order may be considered collateral.

*Melvin v. Doe,* 575 Pa. 264, 836 A.2d 42, 46–47 (2003) (internal citations omitted).

**16.** Although a collateral order must be appealed within 30 days of its entry, "the timeliness of appeals from collateral orders depends not upon entry of the order itself, but upon resolution of the collateral matter." *Jones v. Faust,* 852 A.2d 1201, 1203 (Pa.Super.2004). Thus, where "the collateral matter" is resolved through a series of interlocutory orders, a timely notice of appeal from the last such order will incorporate a prior order involving segments of same "collateral matter." *Id.*

Moreover, and in keeping with the narrow interpretation of the collateral order doctrine, our Supreme Court has held that "the collateral order rule's three-pronged test must be applied independently to each distinct legal issue over which an appellate court is asked to assert jurisdiction pursuant to Rule 313." *Rae*, 977 A.2d at 1130. Therefore, even if the collateral order test "is satisfied with respect to one [appellate] issue," the assertion of jurisdiction does not necessarily mean that we have "jurisdiction to consider every issue within the ambit of the appealed order." *Id.* at 1123.

At the outset, this Court clearly does not have jurisdiction to consider any appellate issue relating to the merits of claims that the trial court dismissed, as the dismissal orders are not "separable from and collateral to the main cause of action." Pa. R.A.P. 313(b).

As our Supreme Court has held, an order is "separable from and collateral to the main cause of action" if it is capable of review without considering the merits of the underlying cause of action. *Ben v. Schwartz*, 556 Pa. 475, 729 A.2d 547, 551–552 (1999); *Melvin*, 836 A.2d at 45–46. In the case at bar, the trial court completely dismissed all but two of Appellants' claims—and the trial court dismissed the claims at either the preliminary objection or summary judgment stage of the proceedings. Moreover, with respect to every claim that the trial court dismissed, the trial court ruled that dismissal was necessary because Appellants either failed to properly plead a valid cause of action or failed to demonstrate that there was a "genuine issue of [ ] material fact as to a necessary element of the[ir] cause of action." *See Cardenas v. Schober*, 783 A.2d 317, 321 (Pa.Super.2001), *citing* Pa.R.C.P. 1028; Pa.R.C.P. 1035.2(1).

On appeal—with the exception of but one claim—Appellants have argued that the trial court erred in dismissing their claims on the merits. Obviously, in this context, review of the trial court's orders would necessarily require that we "consider[ ] the merits of the underlying [ ] action." *Melvin*, 836 A.2d at 46 (emphasis omitted). As this Court has explained:

[an order sustaining preliminary objections and dismissing a claim] actually denies the **existence** of [the plaintiff's] cause of action.... It is axiomatic that the disposition of preliminary objections necessarily involves an examination of the merits of the pleaded causes of action. Therefore, an order sustaining preliminary objections cannot be considered separate from or collateral to the main cause of action since such an order directly addresses the validity of the challenged cause of action and concludes that it is deficient.

*Niemiec v. Allstate Ins. Co.*, 721 A.2d 807, 810 (Pa.Super.1998) (emphasis in original).

The same is true of an order that dismisses a claim at the summary judgment stage of the proceedings. Certainly, whether the trial court dismisses a claim at the preliminary objection or summary judgment stage of the proceedings, the subject order "directly addresses the validity of the challenged cause of action and concludes that it is deficient." *Id.*

Given that Appellants have—in all but one instance—simply claimed that the trial court erred in its merits analysis of their claims, review of the preliminary objection and summary judgment orders would, by definition, demand consideration of the underlying merits of the cause of action. Thus, those orders do not fall under the collateral order doctrine.

Hence, in accordance with the above discussion, this Court does not have jurisdiction to consider: Appellants' first, second, and third appellate claims (wherein

Appellants argue that the trial court erred in dismissing their breach of contract claims); a portion of Appellants' fourth appellate claim (wherein Appellants argue that the trial court erred in dismissing their breach of fiduciary duty claim); Appellants' fifth appellate claim (wherein Appellants argue that the trial court erred in dismissing their "breach of contract: modification" claim); or, Appellants' sixth appellate claim (wherein Appellants argue that the trial court erred in dismissing a portion of their UTPCPL claim). Appellants' Brief at 18–52 and 61–66.

Further, we do not have jurisdiction to consider the Bank's first appellate claim—wherein the Bank contends that the trial court erred in overruling its demurrer to the McGrogans' individual fraud and UTPCPL claims. The Bank's Brief at 56–60. Simply stated, and again, examination of the trial court's order would necessarily require a merits review of the underlying claims. Thus, the respective order does not satisfy the collateral order doctrine. *Ben,* 729 A.2d at 551–552.

 Finally, at this juncture, we also conclude that we do not have jurisdiction to consider the Bank's second issue on appeal. Within this claim, the Bank contends that the trial court erred in certifying Appellants' "breach of contract: modification" claim (Count 3) for class treatment. The Bank's Brief at 60. The relevant, interlocutory order was entered on July 27, 2011—and the Bank filed its notice of appeal in this case on September 27, 2012.

If the Bank wished to appeal from the trial court's interlocutory order, the Bank was required to file its notice of appeal within 30 days of the date the interlocutory order was entered. Pa.R.A.P. 903(a). Indeed—and although "the timeliness of appeals from collateral orders depends ... upon resolution of the collateral matter"— the "collateral matter" at issue here (the grant of class certification) was "resolved" on July 27, 2011, when the trial court entered its order certifying the class. *Jones,* 852 A.2d at 1203.

Therefore, since the trial court's order was entered on July 27, 2011 and the Bank did not file its notice of appeal in this case until September 27, 2012, the Bank's notice of appeal from this interlocutory order is untimely and we do not have jurisdiction to pass on the merits of the Bank's second claim.[17] *Valley Forge Ctr. Assoc's v. Rib-It/K.P., Inc.,* 693 A.2d 242, 245 (Pa.Super.1997) ("an untimely appeal divests this Court of jurisdiction").

 We must now determine whether we have jurisdiction to consider the single remaining claim on appeal: whether the trial court "improperly refused to certify Appellants' [c]lass [a]ction [c]laims for fraud in the execution [ (Count 1) ] and unfair trade practices [ (Count 5) ]." Appellants' Brief at 53.

As the explanatory comment to Pennsylvania Rule of Appellate Procedure 341 declares, "in an appropriate case ... an order denying class certification in a class action case ... might fall under" the col-

---

**17.** Further, even if we had jurisdiction to consider the merits of the Bank's claim, we would conclude that the claim is moot and unreviewable. Certainly, while the Bank argues that the trial court erred in certifying Appellants' "breach of contract: modification" claim (Count 3) for class treatment, the trial court dismissed Count 3, in its entirety, at the summary judgment stage. Trial Court

Order, 8/30/12, at 1. Therefore, the Bank's claim of error would be moot. *See Johnson v. Martofel,* 797 A.2d 943, 946 (Pa.Super.2002) ("[t]he appellate courts of this Commonwealth will not decide moot or abstract questions except in rare instances.... An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect").

lateral order doctrine. Pa.R.A.P. 341 cmt. Moreover, in a series of cases, this Court has explicitly held that "an order denying class certification is appealable under the collateral order doctrine." *Clark v. Pfizer Inc.*, 990 A.2d 17, 23 n. 3 (Pa.Super.2010); *see also Weinberg v. Sun Co.*, 740 A.2d 1152, 1161–1162 (Pa.Super.1999), *reversed in part on other grounds*, 565 Pa. 612, 777 A.2d 442 (2001); *DiLucido v. Terminix Int'l, Inc.*, 450 Pa.Super. 393, 676 A.2d 1237, 1238–1239 (1996), *abrogated on other grounds by Weinberg v. Sun Co.*, 565 Pa. 612, 777 A.2d 442 (2001); *Hanson v. Fed. Signal Corp.*, 451 Pa.Super. 260, 679 A.2d 785, 787–788 (1996). As we have explained, an order denying class certification is usually appealable under the collateral order doctrine because:

> [T]he order ... is separable from and collateral to the cause of action for liability[, as the class certification issue is not concerned with the underlying merits of the action. *See* Pa.R.C.P. 1707 cmt. (class certification "is not concerned with the merits of the controversy or with attacks on the other averments of the complaint"). Rather, the class certification order is merely concerned with: the numerosity of the proposed class and the practicalities of joinder; whether questions of law and fact are common to the proposed class; whether the representative parties have claims and defenses that are typical of the proposed class; whether the representative parties "will fairly and adequately assert and protect the interests of the class;" and, whether a class action provides a fair and efficient method for adjudicating the controversy. Pa.R.C.P. 1702] ....

Next, we note that class actions were established to provide a means by which the claims of many individuals could be resolved at one time, thereby eliminating the possibility of repetitious litigation and providing small claimants with a method to seek compensation for claims that would otherwise be too small to litigate. Undoubtedly, the opportunity to litigate a meritorious claim is a right that warrants review....

Finally, if not immediately appealable, this right would be lost. Any persons who chose to proceed individually would eventually obtain their remedy and would have no reason to appeal the denial of certification, while those with small claims would be turned away without recourse.

*Hanson*, 679 A.2d at 788 (internal quotations and corrections omitted), citing *DiLucido*, 676 A.2d at 1239. Further, we note that the right may also be lost because, if the McGrogans were to prevail on their individual claims at trial, the McGrogans might very well choose not to appeal the denial of the decertification order, leaving would-be class members no recourse or vehicle through which they could litigate their claims.

■ Given the above, we conclude that the trial court's July 27, 2011 order, wherein the trial court denied class certification to the "fraud in the execution" (Count 1) and the "violation of the UTPCPL" (Count 5) claims, is appealable under the collateral order doctrine.[18] Appellants' claim, however, fails.

We have held:

**18.** Unlike the "collateral matter" concerning the **grant** of class certification, the "collateral matter" concerning the **denial** of class certification was "resolved" on August 30, 2012— when the trial court dismissed the one claim that it had previously granted class certification. Therefore, Appellants' September 4, 2012 notice of appeal (from the August 30, 2012 order) was timely. *Jones*, 852 A.2d at 1203.

In Pennsylvania, trial courts are vested with broad discretion in deciding whether to certify a class action. We will not disturb an order denying class certification on appeal unless the trial court neglected to consider the requirements of the rules or abused its discretion in applying them.

*Clark,* 990 A.2d at 23 (internal citations omitted).

As briefly stated above, Pennsylvania Rule of Civil Procedure 1702—entitled "prerequisites to a class action"—provides:

One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

Pa.R.C.P. 1702.

On appeal, Appellants argue that the trial court erred in denying their motion for class certification, as the trial court mistakenly held that the necessary element of "reliance"—in both the "fraud in the execution" (Count 1) and the "violation of the UTPCPL" (Count 5) claims—varied from person to person. According to Appellants, since the Bank owed a fiduciary duty to the IRA Market Rate Savings Account holders, "detrimental reliance is presumed, and such reliance need not be shown separately for each class member." Appellants' Brief at 60.

Yet, and even assuming that Appellants are correct in their legal assertion, Appellants would still not be entitled to relief in this case. As we have earlier explained, the trial court denied class certification as to the "fraud in the execution" (Count 1) and "violation of the UTPCPL" (Count 5) claims because there were **three** significant issues of law and fact that were uncommon to the class. Specifically, the trial court held: 1) "not all persons who purchased the IRA Market Rate Savings Accounts [would] testify that the bank officials told them that the 8% interest rate was guaranteed;" 2) "even customers who [would] testify they were promised 8% interest [did] not describe the same guarantee;" and, 3) the mandatory element of "reliance" would necessarily "vary from person to person." Trial Court Opinion, 7/27/11, at 2–3. On appeal, Appellants have claimed only that the trial court erred in reaching one of these three conclusions.

It is well established that an appellate court may neither litigate for the parties nor "reverse a trial court judgment on a basis that was not properly raised and preserved by the parties." *Steiner v. Markel,* 600 Pa. 515, 968 A.2d 1253, 1256–1257 (2009). In this case, since Appellants have only taken issue with one of the trial court's three independent grounds for denying the motion for class certification, Appellant's claim on appeal necessarily fails.

Thus, in summary, to the extent the trial court's order denied class certification to Appellants' "fraud in the execution" claim (Count 1) and "violation of the UTPCPL" claim (Count 5), we affirm that order. We lack jurisdiction to consider the remaining issues raised by Appellants in their appeal docketed at 1358 WDA 2012. We quash

the Bank's appeal at docket number 1490 WDA 2012.

Order affirmed at 1358 WDA 2012. Appeal quashed at 1490 WDA 2012. Jurisdiction relinquished.