IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Sheriff's Excess : 
Proceeds Litigation : 
 : 
Appeal of: Joseph O'Hara and : No. 1246 C.D. 2013
Finn Land Corp. : Argued: May 13, 2014


BEFORE:   HONORABLE MARY HANNAH LEAVITT, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE ANNE E. COVEY, Judge

OPINION BY
JUDGE COVEY                          FILED:  July 31, 2014


Joseph O'Hara (O'Hara) and Finn Land Corporation (Finn Land) (collectively, Plaintiffs) appeal from the Philadelphia County Common Pleas Court's (trial court) March 12, 2013 order denying their motion for class certification in litigation against the Philadelphia County Sheriff's Office (Sheriff's Office).  Before we address this Court's jurisdiction,[1] we set forth the facts that led to the instant litigation.

On October 25, 2010, the City of Philadelphia's (City) Controller released a routine report auditing the Sheriff's Office's finances for fiscal years 2007-2009.  *See* Reproduced Record (R.R.) at 71a-85a.  In the executive summary, the Controller recommended a forensic audit because

> [t]he Controller's Office has concerns about the potential for errors or irregularities with respect to nearly $53 million in custodial funds being held by the Sheriff's Office. Repeated requests . . . for accounting records involving some of these funds[] went unanswered through the end of our fieldwork.  Coupled with poor control procedures that

---

[1] On August 14, 2013, this Court ordered the parties to address in their briefs on the merits the appealability of the trial court's March 12, 2013 order pursuant to Pennsylvania Rule of Appellate Procedure (Pa.R.A.P.) 313.

provide ample opportunity to misappropriate and conceal a theft of funds, in our opinion, the Sheriff's Office is highly at risk for fraud.

R.R. at 72a.   Specifically concerning undisbursed excess proceeds from Sheriff foreclosure, tax lien and delinquent tax sales, the Controller found that the Sheriff's Office failed to remit these funds to the City's Finance Department within 15 months and, as of July 2009, the Sheriff's unclaimed funds list "showed well over $8 million that the Sheriff's Office allowed to accumulate in its account – some of it as far back as 2004 – which should have been transferred to the [C]ity."[2]   R.R. at 80a.

Robert McCord, in his official capacity as Treasurer of the Commonwealth of Pennsylvania, and the Treasury Department of the Commonwealth of Pennsylvania (collectively, State Treasurer) audited the Sheriff's Office in December 2010.  The audit revealed that, between May 23 and August 10, 2011, the Sheriff's Office remitted a total of $11,417,898.00 to the State Treasurer's Bureau of

---

[2] When a foreclosure sale generates proceeds in excess of existing tax liens and costs, Pennsylvania Rule of Civil Procedure (Pa.R.C.P.) No. 3136 requires the Sheriff to distribute the excess proceeds to the former property owner (property owner) after approximately 40 days. Pa.R.C.P. No. 3136(a) specifically provides: "Not later than thirty days after the sale of real property . . .  the sheriff shall prepare a schedule of proposed distribution of the proceeds of sale which shall be kept on file and shall be available for inspection in the sheriff's office."  Pa.R.C.P. No. 3136(d) states: "The sheriff shall distribute the proceeds of sale in accordance with the proposed schedule of distribution, unless written exceptions are filed with the sheriff not later than ten (10) days after the filing of the proposed schedule."

The City's Standard Accounting Procedure E-33.001 requires that after 15 months, unclaimed funds are to be transferred by the Sheriff's Office to the City's Finance Department.  If the property owner fails to cash the distribution check or to claim the funds within 5 years, the City's Finance Department is mandated to pay the unclaimed amounts to the Treasurer of the Commonwealth of Pennsylvania, and the Treasury Department of the Commonwealth of Pennsylvania (collectively, State Treasurer) who then attempts to unite the property owner with the excess proceeds.  Sections 1301.9, 1301.12 and 1301.13 of the Fiscal Code, Act of April 9, 1929, P.L. 343, *as amended*, added by Section 5 of the Act of December 9, 1982, P.L. 1057, 72 P.S. §§ 1301.9 (property unclaimed from a public officer or political subdivision for more than 5 years is presumed abandoned and unclaimed), 1301.12 (State Treasurer's notice and claim submission procedures), 1301.13 (process for payment and delivery of unclaimed property to the State Treasurer).

Unclaimed Property (Bureau).[3]   Pursuant to the Controller's October 2010 recommendation, in October 2011, Deloitte Financial Advisory Services, LLP (Deloitte) conducted a forensic investigation of the City's finances.  The investigation revealed that between 2006 and 2010, the Real Estate Division of the Sheriff's Office conducted over 61,500 property sales (consisting of mortgage foreclosure, tax lien and delinquent tax sales) and failed to distribute millions of dollars in excess proceeds from the real property sales to the property owners.[4]  *See* R.R. at 48a-69a. Deloitte reported, *inter alia*:

> The average monthly balance in the Sheriff's Office['s] three unclaimed fund bank accounts from 2006 through 2010 totaled **$5,172,805[.00]**.  A primary source of these unclaimed funds was undistributed excess sales proceeds. These monies belonged to the evicted homeowner who was unaware of the existence of the monies, and the Sheriff was unable to locate the homeowner after eviction.

R.R. at 56a.[5]

Plaintiffs owned City properties sold at Sheriff's sale.[6]  Plaintiffs filed a complaint with the trial court, wherein they claimed that excess proceeds remained

---

[3] The Sheriff's Office made 3 identical payments to the State Treasurer on May 23, 2011, June 2, 2011 and June 8, 2011 as follows:  $517,285.64 from the Tax Lien Account, $281,275.15 from the Mortgage Foreclosure Account, and $206,958.98 from the Tax Delinquent Account.  On August 10, 2011, the Sheriff's Office made additional payments to the State Treasurer as follows: $4,131,856.96 from the Tax Lien Account, $2,740,729.15 from the Mortgage Foreclosure Account, and $1,528,752.58 from the Tax Delinquent Account.

[4] In 2006, the State Treasurer conducted an audit finding that the Sheriff's Office had unclaimed property liability of $11,060,625.00 as of December 31, 1998, due to deficiencies in its ability to identify and report unclaimed property.  R.R. at 142a-154a.  The resultant audit report concluded: "We recommend that the Sheriff's Office develop a formal policy and written procedures for its record-keeping system, incorporating the preceding steps as enumerated above." R.R. at 154a.

[5] Deloitte's report referenced a 2004 State Treasurer audit of the Sheriff's unclaimed property accounts and a 2006 post-audit examination.  *See* R.R. at 56a.

[6] O'Hara is Finn Land's president and sole employee.  *See* Joint Supplemental Reproduced Record (J.S.R.R.) at 39b-40b.  He buys and sells properties individually and in Finn Land's name. He has bought and sold approximately 60 properties since 1990, individually, under Tin Lion

3

with the Sheriff's Office after the tax liens were paid and, despite numerous requests, the Sheriff's Office did not remit the excess monies. In the spring of 2011, Michelle Pingitore (Pingitore) (Docket No. 1103-1141) and Marie Virelli (Virelli) (Docket No. 1105-0387) filed class action complaints with the trial court against the City, the Sheriff's Office and two former Sheriffs - John Green (who resigned effective December 31, 2010) and Barbara Deeley (former Chief Deputy under Green, and acting Sheriff when the complaints were filed). In June 2011, O'Hara and Virelli filed an amended class action complaint against the same above-named defendants for restitution/unjust enrichment, conversion and fraudulent concealment. The trial

---

Enterprises (between 1995 and 2006) or under Finn Land (beginning in 2007 or 2008), 6 of which have gone to tax sale. *See* J.S.R.R. at 38b-39b. Since May 2010, when the Sheriff's Office made its computer system available to the public, O'Hara has worked as a "finder," locating former property owners who are owed excess sale proceeds from the Sheriff's sale of their real estate. *See* J.S.R.R. at 40b-41b. In this capacity, O'Hara notifies former property owners by letter that they may have monies due them, that he will help them recover such funds for a contingency fee, and that they should contact him if they would like his help. *See* J.S.R.R. at 41b.

O'Hara purchased 2006 North 5th Street in 2009 from an estate. *See* R.R. at 199a. He does not recall how he became aware of the property, but sent the executor a letter offering to purchase the property prior to its Sheriff's sale. *See* R.R. at 200a. He paid approximately $30,000.00 to the estate, recorded a deed, paid half of the taxes and secured a 90-day continuance of the Sheriff's sale. *See* R.R. at 199a. He testified that he made "a business decision . . . [n]ot to pay the other half" of the taxes, knowing it would go to Sheriff's sale; which it did, in the name of the estate and its representative. R.R. at 200a-(the first of two pages marked) 201a. The property sold at Sheriff's sale for $40,500.00 and, after other costs and liens were paid, he was owed approximately $9,000.00 in excess sale proceeds. *See* R.R. at 200a-(the second of two pages marked) 201a. In October 2010 in order to obtain title insurance, at the request of RCS Searchers, Inc. (RCS), O'Hara executed a quitclaim deed with Berg Equity LLC. *See* R.R. at (both of the pages marked) 201a. *See also* R.R. at 287a-323a.

According to the record, in August 2009, O'Hara, as Finn Land, purchased 3571 Frankford Avenue prior to its Sheriff's sale, and recorded a deed. *See* R.R. at 324a. Finn Land paid sufficient money to secure a 90-day continuance of the Sheriff's sale. *See* R.R. at 324a. The property eventually sold at Sheriff's sale for $21,500.00 and, after other costs and liens were paid, Finn Land was owed approximately $6,383.42 in excess sale proceeds. *See* R.R. at 324a-325a. O'Hara also notified the Sheriff's Office that Finn Land overpaid $10,623.00 in taxes for the property. *See also* R.R. at 324a-347a.

court consolidated the cases in August 2011, with Docket No. 1105-0387 as the lead case.

In July 2011, the State Treasurer filed with the trial court a petition for leave to intervene. The State Treasurer asserted that it had an interest in the action under The Fiscal Code (referred to herein as the Disposition of Abandoned and Unclaimed Property Act (DAUPA)),[7] which sets forth when and how funds held by the Sheriff's Office escheat to the State Treasurer who is then responsible for disbursing them.[8] Plaintiffs[9] opposed the petition to intervene. The State Treasurer also filed preliminary objections to Plaintiffs' amended complaint, seeking to have it dismissed on grounds that DAUPA is the exclusive statutory remedy to recover excess sale proceeds unclaimed after 5 years. The trial court granted the State Treasurer's petition to intervene on August 3, 2011, thereby making the State Treasurer a defendant in the action.[10] The trial court overruled the State Treasurer's preliminary objections on November 14, 2011. Thereafter, discovery was undertaken.

---

[7] 72 P.S. §§ 1301.1- 1301.29. The original DAUPA was repealed effective January 1, 1982.

[8]
> Until 1992, Article XIII.1 of [DAUPA] was administered by the Secretary of Revenue of the Commonwealth who is still designated by the statute as the responsible Commonwealth official today. By Act No. 180 of 1992, however, the General Assembly amended The Administrative Code of 1929 [by adding Section 1105 of] Act of April 9, 1929, P.L. 177, *as amended,* [added by Section 2 of the Act of December 18, 1992, P.L. 1638,] 71 P.S. § 325, to provide, *inter alia,* that '[t]he powers and duties of the Secretary of Revenue under Article XIII.1 of [DAUPA] are hereby transferred to the State Treasurer.'

*Delaware Cnty. v. J.P. Morgan Chase & Co.*, 827 A.2d 594, 597 n.8 (Pa. Cmwlth. 2003).

[9] According to the trial court's opinion, Pingitore and Virelli ultimately received their excess funds and withdrew their claims, leaving O'Hara and Finn Land as the representative Plaintiffs. Trial Ct. Op. at 2 n.1. The record is unclear as to when this occurred.

[10] According to the trial court's opinion, Plaintiffs have yet to assert any claims against the State Treasurer.

In March 2012, the City/Sheriff's Office and the State Treasurer entered into a Settlement Agreement reflecting that the Sheriff's Office had a $15,002,076.00 balance in its civil database. *See* R.R. at 349a-351a. According to Appendix A of the Settlement Agreement, after reconciling adjustments (including remittances already made to the City's Department of Revenue) and accounting for properties not sold, the Sheriff's Office owed the State Treasurer $11,986,319.00. *See* R.R. at 351a. The Sheriff's Office reserved the right to claim refunds from the State Treasurer if the Sheriff's Office made payments on pending claims after the funds were transmitted. *See* R.R. at 315a.

On July 20, 2012, Plaintiffs filed a Second Amended Consolidated Class Action Complaint including mandamus, due process, unjust enrichment, equitable conversion and fraudulent concealment claims. Plaintiffs listed the following questions of fact in common with the putative class members:

> a. Whether the [City's] Sheriff's Office had a process in place for the return of Excess Proceeds generated by mortgage and tax foreclosure sales conducted by the Sheriff's Office . . . to the property owner?
>
> b. Whether the [City's] Sheriff's Office failed to follow any process that it had in place for the return of Excess Proceeds generated by mortgage and tax foreclosure sales conducted by the Sheriff's Office . . . to the property owner?
>
> c. Whether the [City's] Sheriff's Office failed to return Excess Proceeds arising from mortgage and tax foreclosure sales conducted by the Sheriff's Office . . . to former owners of the subject properties[?]; and
>
> d. [T]he nature and extent of class-wide injury and the measure of damages for the injury.

Plaintiffs' Second Amended Consolidated Class Action Complaint at ¶ 54. Plaintiffs enumerated the following common questions of law:

6

a. Whether Defendants fraudulently concealed from Plaintiffs their entitlement to receive Excess Proceeds;

b. Whether Defendants were unjustly enriched by their retention of the Excess Proceeds;

c. Whether Defendants converted to their own use the monies that should have been returned to Plaintiffs as Excess Proceeds;

d. Whether Plaintiffs will suffer an injustice if recovery is denied?

Plaintiffs' Second Amended Consolidated Class Action Complaint at ¶ 54. For each claim, Plaintiffs seek "judgment in the amount of excess proceeds that should have been remitted to Plaintiffs and each such class member, together with interest, damages, costs, attorney's fees, and such other relief as is permitted by law and is deemed appropriate by the Court." Plaintiffs' Second Amended Consolidated Class Action Complaint at 18-24.

On October 1, 2012, Plaintiffs filed a motion requesting the trial court to certify a class comprised of the following two subclasses:

a. Each real property owner(s) within the County of Philadelphia during the time period January 1, 2006 to December 31, 2011 whose real property was sold at a Philadelphia Sheriff's sale and who is entitled to, but did not receive, payment from the Philadelphia Sheriff's Office, of the excess Sheriff's sale proceeds after satisfaction of the judgment lien(s) creditor's obligation, other applicable encumbrances, and the Sheriff's costs and fees, and whose money has not been transferred from the Sheriff unclaimed funds escrow accounts to the State Treasurer's escrow account;[] [Excess Funds Class – seeks excess funds].

b. Each real property owner(s) within the County of Philadelphia during the time period January 1, 1999 to December 31, 2005 whose real property was sold at a Philadelphia Sheriff's sale and who was entitled to, but did not receive payment form [sic] the Philadelphia Sheriff's Office, of the excess Sheriff's sale proceeds after satisfaction of the judgment lien(s) creditor's obligation,

7

other applicable encumbrances, and the Sheriff's costs and fees, and who was damaged by the wrongful acts committed by the Sheriff, and does not include claims for the actual moneys which were or have been transferred from the Sheriff unclaimed funds escrow accounts to the State Treasurer's escrow account pursuant to DAUPA. [Escheated Funds Class – seeks interest on funds escheated to the State Treasurer].

Certified Record (C.R.) Item 56, Motion for Class Certification ¶ 10. A class certification hearing was held on February 13, 2013. By March 12, 2013 order, the trial court denied the motion because Plaintiffs failed to satisfy the numerosity, typicality, representation adequacy, and fair and efficient methodology requirements for class certification. The trial court also held that the trial court was not the proper forum since each party could seek funds from the Sheriff's Office in accordance with the Pennsylvania Rules of Civil Procedure or from the State Treasurer under DAUPA. Plaintiffs appealed to this Court.[11]

## I. **APPEALABILITY**

This Court's order directing the parties to address whether the trial court's order is appealable implicates this Court's jurisdiction.

---

[11] Class certification presents a mixed question of law and fact. The trial court is vested with broad discretion in deciding whether an action may be pursued on a class-wide basis and, where the court has considered the procedural requirements for class certification, an order granting class certification will not be disturbed on appeal unless the court abused its discretion in applying them. An abuse of discretion will be found if the certifying court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact; the trial court must have exercised unreasonable judgment, or based its decision on ill will, bias, or prejudice.

*Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 15 (Pa. 2011) (citations and quotation marks omitted).

8

> Ordinarily, a final order is any order that disposes of all claims and of all parties or is expressly defined as a final order by statute. Pa.R.A.P. 341(b)(1), (2). Appeals are permitted only from final orders so as to prevent piecemeal determinations and the consequent protraction of litigation. The general rule that a final order is required before an appeal may be taken is fundamental to the exercise of jurisdiction by the appellate court and is rigorously applied.

*Brophy v. Phila. Gas Works & Phila. Facilities Mgmt. Corp.*, 921 A.2d 80, 86 (Pa. Cmwlth. 2007) (citations omitted). Class action certification is one of those "orders that are no longer appealable as final orders pursuant to Rule 341 but which, **in an appropriate case**, might fall under . . . [Pa.R.A.P. 313]." Pa.R.A.P. 341 Note (emphasis added). Pa.R.A.P. 313(a) creates an exception to the general rule for collateral orders, making them immediately appealable as of right. "A collateral order is" defined as:

> [1] an order separable from and collateral to the main cause of action [2] where the right involved is too important to be denied review and [3] the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

Pa.R.A.P. 313(b). "The collateral order doctrine 'is to be construed narrowly to preserve the integrity of the general rule that only final orders may be appealed; thus, the requirements for a collateral order are applied relatively stringently.'" *Pittsburgh Water & Sewer Auth. v. Gladstone*, 999 A.2d 1248, 1254 (Pa. Cmwlth. 2010) (quoting *In re Estate of Stricker*, 977 A.2d 1115, 1119 (Pa. 2009)).

In *Dunn v. Allegheny County Property Assessment Appeals & Review*, 794 A.2d 416, 423 (Pa. Cmwlth. 2002), *aff'd*, 936 A.2d 487 (Pa. 2007), this Court specifically held that "an order denying class action certification is a collateral order and, as such, is appealable under Pa.R.A.P. 313." Although the *Dunn* Court reached its conclusion having analyzed only the separability requirement of Pa.R.A.P. 313(b), the law makes clear that the Pa.R.A.P. 313(b) criteria – separability, importance <u>and</u>

urgency – must be applied, and only those claims that meet all three criteria will be immediately reviewable. *Rae v. Pennsylvania Funeral Dirs. Ass'n,* 977 A.2d 1121 (Pa. 2009); *see also Pittsburgh Water & Sewer Auth.*

The collateral order doctrine was first set forth in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). Our Supreme Court first applied the doctrine in *Bell v. Beneficial Consumer Discount Co.*, 348 A.2d 734 (Pa. 1975). The collateral order doctrine was refined by *Geniviva v. Frisk*, 725 A.2d 1209 (Pa. 1999), wherein the Pennsylvania Supreme Court, having recognized that the collateral order doctrine often had been applied without a significant analysis of the specific Pa.R.A.P. 313(b) criteria, analyzed each of the three elements to narrow judicial discretion and "allow for predictable application to different circumstances." *Id.* at 1211; *see also Ben v. Schwartz*, 729 A.2d 547 (Pa. 1999). More recently, our Supreme Court in *Rae* upheld the strict application of the collateral order doctrine so not to undermine the finality rule. The *Rae* Court expressed that "**the collateral order** rule's **three-pronged test must be applied independently to each distinct legal issue** over which an appellate court is asked to assert jurisdiction pursuant to [Pa.R.A.P.] 313."[12] *Id.* at 1130 (emphasis added).

In *Brophy*, this Court applied all three Pa.R.A.P. 313(b) criteria when evaluating the immediate appealability of orders denying class certification. Recently, in *McGrogan v. First Commonwealth Bank*, 74 A.3d 1063 (Pa. Super. 2013), our sister court did likewise, explaining:

---

[12] In *Rae*, the Supreme Court reviewed as a matter of first impression whether Pa.R.A.P. 313 requires an issue-by-issue versus whole order application. The *Rae* Court adopted an issue-by-issue application. Thus, even if the collateral order test "is satisfied with respect to one [appellate] issue," this Court does not have "jurisdiction to consider every issue within the ambit of the appealed order." *Rae*, 977 A.2d at 1123. Permission to appeal may be sought for those issues for which the collateral order elements are not fulfilled. *See* 42 Pa.C.S. § 702(b).

[I]n a series of cases, this Court has explicitly held that 'an order denying class certification is appealable under the collateral order doctrine.' *Clark v. Pfizer Inc.,* 990 A.2d 17, 23 n.3 (Pa. Super. 2010); *see also Weinberg v. Sun Co.,* 740 A.2d 1152, 1161–[]62 (Pa. Super. 1999), *reversed in part on other grounds, . . .* 777 A.2d 442 ([Pa.] 2001); *DiLucido v. Terminix Int'l, Inc., . . .* 676 A.2d 1237, 1238–[]39 ([Pa. Super.] 1996), *abrogated on other grounds by Weinberg v. Sun Co., . . .* 777 A.2d 442 ([Pa.] 2001); *Hanson v. Fed. Signal Corp., . . .* 679 A.2d 785, 787–[]88 ([Pa. Super.] 1996). As we have explained, an order denying class certification **is usually appealable** under the collateral order doctrine **because**:

> [T]he order . . . is **separable** from and collateral to the cause of action for liability[, as the class certification issue is not concerned with the underlying merits of the action. *See* Pa.R.C.P. [No.] 1707 cmt. (class certification 'is not concerned with the merits of the controversy or with attacks on the other averments of the complaint'). Rather, the class certification order is merely concerned with: the numerosity of the proposed class and the practicalities of joinder; whether questions of law and fact are common to the proposed class; whether the representative parties have claims and defenses that are typical of the proposed class; whether the representative parties 'will fairly and adequately assert and protect the interests of the class;' and, whether a class action provides a fair and efficient method for adjudicating the controversy. Pa.R.C.P. [No.] 1702 . . . .
>
> Next, we note that class actions were established to provide a means by which the claims of many individuals could be resolved at one time, thereby eliminating the possibility of repetitious litigation and providing small claimants with a method to seek compensation for claims that **would otherwise be too small to litigate**. Undoubtedly, the opportunity to litigate a meritorious claim is a right that warrants review. . . .
>
> Finally, if not immediately appealable, **this right would be lost**. Any persons who chose to proceed

11

> individually would eventually obtain their remedy and would have no reason to appeal the denial of certification, while those with small claims would be turned away without recourse.

*McGrogan*, 74 A.3d at 1079 (emphasis added) (quoting *Hanson*, 679 A.2d at 788). Although orders denying class action have usually been deemed appealable, "each distinct legal issue over which an appellate court is asked to assert jurisdiction" must meet the **separability**, **importance** <u>and</u> **urgency** requirements in order to be immediately appealable under Pa.R.A.P. 313. *Rae*, 977 A.2d at 1130. Thus, in this appeal we must review each of Plaintiffs' claims to determine whether each legal issue meets all three Pa.R.A.P. 313(b) criteria.[13]

### Issues Appealed from the Trial Court's Class Certification Denial

The four distinct legal issues Plaintiffs appealed to this Court are: (1) whether this Court has original jurisdiction to entertain Plaintiffs' class action in light of the State Treasurer's intervention; (2) whether the trial court abused its discretion in applying Pa.R.C.P. No. 1708(a)(5) to determine that the trial court was not the appropriate forum to decide this case; (3) whether the trial court abused its discretion in applying Pa.R.C.P. Nos. 1702, 1708 and 1709 to determine that the numerosity, typicality and adequacy of representation requirements were not met; and (4) whether the trial court's order violated the rule of coordinate jurisdiction.

### Separability

This Court has held that "[a]n order is separable if it does not affect the merits of the main cause of action." *Pittsburgh Water & Sewer Auth.*, 999 A.2d at 1254. However, "[the Pennsylvania Supreme] Court has adopted a practical analysis

---

[13] "Whether an order is appealable under [Pa.R.A.P.] 313 is a question of law. As such, [the Court's] review is plenary." *Commonwealth v. Williams*, 86 A.3d 771, 781 (Pa. 2014).

12

recognizing that some potential interrelationship between merits issues and the question sought to be raised in the interlocutory appeal is tolerable." *Pridgen v. Parker Hannifin Corp.*, 905 A.2d 422, 433 (Pa. 2006). Thus,

> [s]o long as the issue 'is conceptually distinct from the merits . . ., that is, where, even if practically intertwined with the merits, [it] nonetheless raises a question that is significantly different from the questions underlying [the party's] claim on the merits,' it is separable from the main cause of action.

*Commonwealth v. Williams*, 86 A.3d 771, 781 (Pa. 2014) (quoting *Pridgen*, 905 A.2d at 433).

In this case, Plaintiffs' class action lawsuit is based upon their claims that the Sheriff's Office violated procedures for distribution of excess proceeds from its Sheriff's sales. Because Plaintiffs' issues on appeal – whether the State Treasurer's intervention affected the trial court's jurisdiction; whether the trial court is the proper forum for Plaintiffs' claims under Pa.R.C.P. No. 1708(a)(5); whether Plaintiffs' action meets the class certification requirements in Pa.R.C.P. Nos. 1702, 1708 and 1709; and, whether the trial court violated the coordinate jurisdiction rule – are independent of and do not affect the merits of Plaintiffs' case, we hold that each issue meets the separability requirement of Pa.R.A.P. 313(b).

## Importance

"[U]nder [Pa.R.A.P.] 313, it is not sufficient that the issue be important to the particular parties. Rather it must involve rights deeply rooted in public policy going beyond the particular litigation at hand." *Geniviva*, 725 A.2d at 1214. The Pennsylvania Supreme Court has stated: "[B]efore concluding an issue . . . implicates a right too important to be denied review[,] we consider whether the right is important compared to the costs of piecemeal litigation and the efficiency interests

sought to be advanced by adherence to the final judgment rule."[14] *Rae*, 977 A.2d at 1129 (quotation marks omitted). Issues that the courts have deemed deeply rooted in public policy have included privilege (*Rae*), qualified immunity (*Mitchell v. Forsyth*, 472 U.S. 511 (1985)), free speech, (*Melvin v. Doe*, 836 A.2d 42 (Pa. 2003)), and privacy (*J.S. v. Whetzel*, 860 A.2d 1112 (Pa. Super. 2004)).

Plaintiffs' first issue as to whether the State Treasurer's intervention affected the trial court's jurisdiction meets the importance prong of Pa.R.A.P. 313(b). Subject matter jurisdiction "is conferred solely by the Commonwealth's Constitution and laws." *Heath v. Workers' Comp. Appeal Bd.,* 860 A.2d 25, 29 (Pa. 2004). Jurisdiction determines a court's competency to decide a general class of cases. *Mercury Trucking, Inc. v. Pennsylvania Pub. Util. Comm'n*, 55 A.3d 1056 (Pa. 2012). Its importance is evident in that, without subject matter jurisdiction, a court is precluded from exercising its judicial power, and any order issued by the court lacking such jurisdiction is void. *See M & P Mgmt., L.P. v. Williams*, 937 A.2d 398 (Pa. 2007). The issue of a court's jurisdiction has been deemed so deeply rooted in public policy that it cannot be conferred or waived by the parties, and it can be raised by the parties or the court at any stage of a proceeding. *City of Pittsburgh v. Silver*, 50 A.3d 296 (Pa. Cmwlth. 2012). Since this appeal is the stage at which subject matter jurisdiction has been raised, this Court is called upon to address it now. Under circumstances in which the trial court's class certification denial order may be void after significant time and costs have been expended, we consider the right too important to be denied immediate review. Thus, the issue of whether the State

---

[14] [C]ourts avoid piecemeal review not only out of concern for judicial economy, but out of concern for judicial *accuracy*-because, as a general rule, an appellate court is more likely to decide a question correctly after judgment, where it may consider the claim in the context of a complete adjudication and a fully developed record.

*Rae*, 977 A.2d at 1130.

Treasurer's intervention affected the trial court's jurisdiction meets the importance prong of Pa.R.A.P. 313(b).

Plaintiffs' second and third issues involving the pre-requisites for class certification – namely, Pa.R.C.P. 1708(a)(5)'s proper forum requirement, and the numerosity, typicality, representation adequacy, and fair and efficient adjudication method requirements in Pa.R.C.P. Nos. 1702, 1708 and 1709 – also meet the importance prong of Pa.R.A.P. 313(b). "[P]ublic policy considerations and the avowed purpose of the class action procedure is to permit the aggregation of small claims that would otherwise go unlitigated in individual actions." *Dunn*, 794 A.2d at 427. The purpose of the Sheriff's Office's procedures and DAUPA is to reunite property owners with their excess sale proceeds. Property owners' rights are widely recognized. Section 1301.2(b) of DAUPA assures that "[p]roperty is payable or distributable for the purpose of [DAUPA] notwithstanding the owner's failure to make demand or to present any instrument or document otherwise required to receive payment." 72 P.S. § 1301.2(b).

The U.S. Constitution provides: "No person shall be . . . deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Article I, Section 1 of the Pennsylvania Constitution states: "All men . . . have certain inherent and indefeasible rights, among which are those of . . . acquiring, possessing and protecting property . . . ." Pa. Const. art. I, § 1. Article I, Section 10 of the Pennsylvania Constitution declares: "[P]rivate property [shall not] be taken or applied to public use, without authority of law and without just compensation being first made or secured." Pa. Const. art. I, § 10. Federal and state constitutional Takings Clause provisions are interpreted using the same framework and standards. *See Smith v. Cortes*, 879 A.2d 382 (Pa. Cmwlth. 2005), *aff'd*, 901 A.2d 980 (Pa. 2006). In the context of the Takings Clauses, "a taking occurs when [an] entity clothed with the power

substantially deprives an owner of the use and enjoyment of his property." *People United to Save Homes v. Dep't of Envtl. Prot.*, 789 A.2d 319, 326 (Pa. Cmwlth. 2001).

Plaintiffs' Second Amended Consolidated Class Action Complaint contains counts relating to mandamus, due process, unjust enrichment, equitable conversion and fraudulent concealment. If the Sheriff's Office fraudulently or negligently failed to notify property owners or withheld their funds and reaped benefits therefrom, Plaintiffs' claims arguably "involve rights deeply rooted in public policy going beyond the particular litigation at hand." *Geniviva*, 725 A.2d at 1214. Moreover, as to class actions, this Court has stated: "Within the Commonwealth, the class action is a procedural device designed to promote efficiency and fairness in the handling of large numbers of similar claims, while providing a forum for small claimants to seek compensation for claims that would otherwise be too small to litigate." *Dunn*, 794 A.2d at 423. Under these circumstances, the public policy rights implicated in this litigation are "important compared to the costs of piecemeal litigation and the efficiency interests sought to be advanced by adherence to the final judgment rule." *Rae*, 977 A.2d at 1129 (quotation marks omitted). Thus, Plaintiffs' second and third issues concerning the pre-requisites for class certification meet the importance requirement of Pa.R.A.P. 313(b).

Plaintiff's fourth claim that the trial court violated the coordinate jurisdiction rule likewise meets the importance prong of Pa.R.A.P. 313(b). The coordinate jurisdiction rule is encompassed within the law of the case doctrine. *Zane v. Friends Hosp.,* 836 A.2d 25 (Pa. 2003). With limited exceptions, the rule "commands that upon transfer of a matter between trial judges of coordinate jurisdiction, a transferee trial judge may not alter resolution of a legal question previously decided by a transferor trial judge." *Hunter v. City of Phila.*, 80 A.3d 533, 536 (Pa. Cmwlth. 2013) (quoting *Zane,* 836 A.2d at 29). "Simply stated, this

16

rule provides that judges of coordinate jurisdiction should not overrule each other's decisions." *Id.*

As will be discussed in greater depth herein, Plaintiffs contend that the portion of the trial court's March 12, 2013 order stating that DAUPA is the method by which they and other property owners must recover excess Sheriff's sale proceeds directly conflicts with the trial court's November 14, 2011 order in which it stated that DAUPA is not the exclusive remedy to recover such proceeds. The Pennsylvania Supreme Court has pronounced that "the coordinate jurisdiction rule serves to protect the expectations of the parties, to insure uniformity of decisions, to maintain consistency in proceedings, to effectuate the administration of justice, and to bring finality to the litigation." *Zane*, 836 A.2d at 29. The *Zane* Court explained:

> To accede to a coordinate judge's order that is clearly erroneous would be not only to permit an inequity to work on the party subject to the order, but would allow an action to proceed in the face of almost certain reversal on appellate review. Moreover, the requirement that the prior holding also create a manifest injustice serves as a significant curb on the exception so that it would apply to only those situations in which adhering to the prior holding would be, in essence, plainly intolerable.

*Id.* at 29-30.

Because the rights raised in Plaintiffs' fourth issue stem from deeply-rooted public policy and are "important compared to the costs of piecemeal litigation and the efficiency interests sought to be advanced by adherence to the final judgment rule," we hold that Plaintiffs' fourth issue as to whether the trial court violated the coordinate jurisdiction rule meets the importance requirement of Pa.R.A.P. 313(b). *Rae*, 977 A.2d at 1129 (quotation marks omitted).

17

**Urgency**

"The remaining prong of the collateral order doctrine requires us to consider whether . . . if review is postponed until final judgment in the case, the claim will be irreparably lost." *Ben*, 729 A.2d at 552. As a general matter, the practical effect of the trial court's March 12, 2013 order requires that Plaintiffs continue this action alone, leaving the other property owners to pursue their actions individually. Pa.R.C.P. No. 1710(e). If class certification is delayed until final judgment on Plaintiffs' mandamus, due process, unjust enrichment, equitable conversion and fraudulent concealment claims, the property owners will be put out of court.

The Pennsylvania Supreme Court has ruled:

We believe that orders denying class action status possess sufficiently practical aspects of finality to make them appealable. When an action is instituted by a named individual on behalf of himself and a class, the members of the class are more properly characterized as parties to the action. A subsequent order of a trial court allowing an action to proceed as a class action is not a joinder of the parties not yet in the action. The class is in the action until properly excluded. An order dismissing the class aspects of a suit puts the class members out of court, is a final order for those parties and is therefore appealable. **That the** named plaintiffs can, in theory, individually pursue the action further, and the **ousted members of the class can bring separate individual actions against the defendant does not alter the conclusion that the denial of class action status has put the ousted members of the class 'out of court' for the purpose of this particular action.**[15]

---

[15] Whether or not there is a final judgment relates to Plaintiffs' mandamus, due process, unjust enrichment, equitable conversion and fraudulent concealment claims against the Sheriff's Office because escheated funds under DAUPA are never lost. Thus, Plaintiffs and the other property owners' claims under DAUPA will not be irreparably lost if review of the class certification denial issue is delayed until final judgment on Plaintiffs' claims.

18

*Bell*, 348 A.2d at 736 (citations omitted; emphasis added). Since the trial court's order denying class certification in this case put the property owners out of court for their mandamus, due process, unjust enrichment, equitable conversion and fraudulent concealment claims, Plaintiffs' second and third issues concerning the class certification requirements clearly meet the urgency prerequisite of Pa.R.A.P. 313(b).

Plaintiffs' first issue pertaining to whether the State Treasurer's intervention affected the trial court's jurisdiction also meets this element of Pa.R.A.P. 313(b). Certainly, the non-waivable nature of subject matter jurisdiction means that it cannot be irrevocably lost at any point in the litigation. However, waiting until the litigation at the trial court level has been completed before assessing whether this Court should have had original jurisdiction could result in re-litigation of the entire matter, which would violate the time-honored principles of judicial efficiency and avoiding piecemeal litigation. In that regard, there is urgency in determining at the earliest possible point in this litigation whether the State Treasurer's intervention affected the trial court's jurisdiction or competency to act.

Likewise, although the issue of whether the trial court violated the coordinate jurisdiction rule may not be irrevocably lost if not immediately reviewed by this Court, allowing litigation to proceed to a final order, only to determine that the trial court was all along bound by a contrary determination by the same court, would eviscerate the purpose of judicial efficiency and avoiding piecemeal litigation. Thus, there is urgency in determining whether the trial court violated the coordinate jurisdiction rule.

Based on the foregoing, we hold that the trial court's March 12, 2013 order denying class certification is an immediately appealable collateral order and this Court has jurisdiction to decide all of the issues raised in Plaintiffs' appeal.

19

## II. <u>ORIGINAL JURISDICTION</u>

Plaintiffs assert that this Court has original jurisdiction to entertain Plaintiffs' class action due to the State Treasurer's intervention.[16] We disagree. Subject to certain exceptions not applicable here, Section 761(a)(1) of the Judicial Code provides that this Court shall have original jurisdiction over all civil actions or proceedings "[a]gainst the Commonwealth government, including any officer thereof, acting in his official capacity . . . ." 42 Pa.C.S. § 761(a)(1).[17] In *Delaware County v. J.P. Morgan Chase & Company*, 827 A.2d 594 (Pa. Cmwlth. 2003), this Court explained:

> In *Piper Aircraft Corporation v. Insurance Company of North America*, . . . 417 A.2d 283, 285 ([Pa. Cmwlth.]

---

[16] Plaintiffs' opposition notwithstanding, the State Treasurer was granted intervenor status in August 2011. The State Treasurer participated as a defendant in the litigation for more than a year before Plaintiffs' class certification motion was filed. Plaintiffs did not raise this jurisdictional issue to the trial court, but instead proceeded to litigate the matter in the trial court. Only after Plaintiffs received the trial court's adverse March 2013 decision did they claim that the State Treasurer's involvement invoked this Court's original jurisdiction.

[17] The exceptions to Section 761 of the Judicial Code include:

> (i) actions or proceedings in the nature of applications for a writ of habeas corpus or postconviction relief not ancillary to proceedings within the appellate jurisdiction of the court;
>
> (ii) eminent domain proceedings;
>
> (iii) actions or proceedings conducted pursuant to Chapter 85 (relating to matters affecting government units);
>
> (iv) actions or proceedings conducted pursuant to the act of May 20, 1937 (P.L. 728, No. 193), referred to as the Board of Claims Act; and
>
> (v) actions or proceedings in the nature of trespass as to which the Commonwealth government formerly enjoyed sovereign or other immunity and actions or proceedings in the nature of assumpsit relating to such actions or proceedings in the nature of trespass.

42 Pa.C.S. § 761(a)(1).

1980), we held that 'for this Court to have exclusive original jurisdiction over a suit against the Commonwealth and another party, **the Commonwealth must be an indispensable party to the action**.' We later defined an indispensable party as '**one whose rights are so connected with the claims of the litigants that no relief can be granted without infringing upon those rights** . . . . The mere naming, however, of the Commonwealth or its officers in an action does not conclusively establish this [C]ourt's jurisdiction, and the joinder of such parties when they are only tangentially involved is improper.' *Pennsylvania [Sch. Bds. Ass'n], Inc. v. [Ass'n] of [Sch.] Administrators, Teamsters Local 502,* 696 A.2d 859, 867 (Pa. Cmwlth. 1997).

*Id.* at 598 (emphasis added). The Pennsylvania Supreme Court has declared:

The determination of an indispensable party question involves at least these considerations:

1. Do absent parties have a right or interest related to the claim?

2. If so, what is the nature of that right or interest?

3. Is that right or interest essential to the merits of the issue?

4. Can justice be afforded without violating the due process rights of absent parties?

*Mechanicsburg Area Sch. Dist. v. Kline*, 431 A.2d 953, 956 (Pa. 1981).

The State Treasurer's interests are clearly delineated in DAUPA. Section 1301.9 of DAUPA, 72 P.S. § 1301.9, states in pertinent part: "[A]ll property held for the owner . . . by a public officer or political subdivision thereof, unclaimed by the owner for more than five (5) years from the date it first became demandable or distributable" is "presumed abandoned and unclaimed." Pursuant to Section 1301.13 of DAUPA:

(a) Every person who holds property subject to the custody and control of the Commonwealth shall, . . . on or before April 15 of the year following the year in which the

21

property first became subject to custody and control of the Commonwealth under this article, pay or deliver to the State Treasurer all property subject to custody and control of the Commonwealth under this article, except that, if the owner establishes his right to receive the property to the satisfaction of the holder, or if it appears that for some other reason the property is not then subject to custody and control of the Commonwealth under this article, the holder need not pay or deliver the property to the State Treasurer, but in lieu thereof shall file a verified written explanation of the proof of claim or as to the reason the property is not subject to custody and control of the Commonwealth.

(b) A receipt shall be issued, on behalf of the Commonwealth, for all property received under this article.

(c) Notwithstanding subsection (a) of this section, in the case of the deposits and the sums payable under clauses 1 and 3 of section 1301.3 the amount of such deposits and such sums shall be paid to the State Treasurer on or before the final date for filing the report required by section 1301.11.

(d) Any person who holds property which may become subject to the custody and control of the Commonwealth pursuant to this act may, with the consent of the State Treasurer, report and deliver such property prior to the expiration of any holding period specified for such reporting. Any person who pays or delivers property prior to the expiration of such holding period shall be relieved of further liability pursuant to section 1301.14. Property thus reported may be disposed of pursuant to section 1301.17, but in no event shall the period for filing of claims be diminished by such early delivery or disposition.

72 P.S. § 1301.13. Under Section 1301.14 of DAUPA, 72 P.S. § 1301.14, once the political subdivision transfers the property to the State Treasurer, the Commonwealth assumes custody, and the political subdivision is relieved of liability for the safekeeping thereof. Section 1301.13(d) of DAUPA authorizes the Sheriff's Office to pay funds to the State Treasurer before the 5 years elapses, and relieve itself of liability for their safekeeping.

22

In *Delaware County*, Delaware County filed complaints with the trial court against its sinking fund depository banks seeking to have the banks return to it "all funds deposited in the sinking fund[s] for the payment of the bonds unclaimed by the holders within two years" from the payment due dates. *Id.* at 596-97. Delaware County maintained that the banks were required to return the monies to Delaware County after 2 years, and for Delaware County to escheat the funds to the Commonwealth through the State Treasurer if they remained unclaimed for another 5 years. Instead of returning the monies to Delaware County after 2 years, the banks waited and escheated the funds to the Commonwealth after 7 years. Certain banks joined the State Treasurer as a party to the litigation. Thereafter, the banks that joined the State Treasurer filed motions to transfer the matter from the trial court to this Court on the basis that the Commonwealth was an indispensable party, and the case should be heard by this Court in its original jurisdiction pursuant to Section 761(a)(1) of the Judicial Code.

The State Treasurer (Barbara Hafer) admitted she was an indispensable party, but did not seek to intervene in the litigation. Delaware County opposed the transfer motions arguing that the State Treasurer was not an indispensable party, and that there were other administrative remedies available. The trial court denied the motions on the basis that the State Treasurer was not an indispensable party. The banks filed interlocutory appeals to this Court. Based upon the fact that even if the banks had done as required and returned the monies to Delaware County after 2 years, Delaware County would have escheated the funds to the state after 5 years and since, as of the 7th year, the monies were with the State Treasurer as required, this Court held that neither Delaware County nor the banks could claim the funds. Thus, the State Treasurer was not an indispensable party and the transfer motions were denied. The Court went on to explain that once the banks escheated the funds to the Commonwealth, they were relieved of all liability for the monies and, if Delaware

23

County had a claim over any funds, "it would have to seek them directly from the Commonwealth under the provisions for making such a claim under the [DAUPA]." *Id.* at 600. The *Delaware County* Court's reasoning is dispositive in the instant case.

Here, in 2011, the Sheriff's Office sent the State Treasurer's Bureau $11,417,898.00 which represented $5,683,713.88 from the Sheriff's Office Tax Lien Account, $3,584,554.60 from its Mortgage Foreclosure Account, and $2,149,629.52 from its Tax Delinquent Account. According to Bureau Director Frederick Stollsteimer's affidavit, as of September 1, 2011, the Bureau continued to examine the Sheriff's Office accounts and records to identify unclaimed property held for the period of January 1, 1999 through December 31, 2005. The record is unclear as to whether these escheated amounts corresponded to specific Sheriff's Office transactions or claim numbers.

In accordance with *Delaware County*, to the extent that the State Treasurer is in possession of the Sheriff's excess sale proceeds, pursuant to the DAUPA (even if they were transferred to the State Treasurer in advance of their 5-year holding period), Plaintiffs may only claim these proceeds through the DAUPA process. Accordingly, because the State Treasurer's interests are not essential to the merits of this case, it is not an indispensable party, and thus, the State Treasurer's intervention does not give this Court original jurisdiction to decide Plaintiffs' action.

## III. APPROPRIATE FORUM

Plaintiffs next contend that the trial court abused its discretion in applying Pa.R.C.P. No. 1708(a)(5) to determine that the trial court was not the appropriate forum to hear this case. Plaintiffs specifically assert that the trial court overrode or misapplied DAUPA by holding that DAUPA's specific statutory remedy precluded use of a class action to adjudicate this controversy. We disagree. Pa.R.C.P. No. 1708 sets forth the criteria for determining whether the class action is a

24

fair and efficient method of adjudication.[18]  Pa.R.C.P. No. 1708(a)(5) states that in

determining whether a class action is a fair and efficient method of adjudicating the

[18] Pa.R.C.P. No. 1708 specifically provides:

> [T]he court shall consider among other matters the criteria set forth in subdivisions (a), (b) and (c).
>
> (a) Where monetary recovery alone is sought, the court shall consider
>
> (1) whether common questions of law or fact predominate over any question affecting only individual members;
>
> (2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;
>
> (3) whether the prosecution of separate actions by or against individual members of the class would create a risk of;
>
> (i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;
>
> (ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;
>
> (4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;
>
> (5) whether the particular forum is appropriate for the litigation of the claims of the entire class;
>
> (6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;
>
> (7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.
>
> (b) Where equitable or declaratory relief alone is sought, the court shall consider

25

controversy, the court shall consider "whether the particular forum is appropriate for the litigation of the claims of the entire class[.]" The Pennsylvania Supreme Court explained:

> As a practical matter, the trial court will decide whether certification is proper based on the parties' allegations in the complaint and answer, on depositions or admissions supporting these allegations, and any testimony offered at the class certification hearing. The court may review the substantive elements of the case only to envision the form that a trial on those issues would take. Any consideration of merits issues at the class certification stage pertains only to that stage; the ultimate factfinder, whether judge or jury, must still reach its own determination on these issues at the liability stage.

*Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 15-16 (Pa. 2011) (citations and quotation marks omitted). Here, Plaintiffs have asserted mandamus, due process, unjust enrichment, equitable conversion and fraudulent concealment claims against the Sheriff's Office due to the Sheriff's Office's alleged failure to follow procedure.

Pa.R.C.P. No. 3136 sets forth the Sheriff's proceeds distribution procedure as follows:

> (a) Not later than thirty days after the sale of real property and not later than five days after the sale of personal property, the sheriff shall prepare a schedule of proposed distribution of the proceeds of sale which shall be kept on file and shall be available for inspection in the sheriff's

---

> (1) the criteria set forth in subsections (1) through (5) of subdivision (a), and
>
> (2) whether the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class.
>
> (c) Where both monetary and other relief is sought, the court shall consider all the criteria in both subdivisions (a) and (b).

office. No schedule of distribution or list of liens need be filed when the property is sold to the plaintiff for costs only.

(b) When a receipt of the plaintiff or other lien creditor has been accepted on account of the purchase price, the schedule shall set forth the name and address of the plaintiff or lien creditor, the amount of the judgment or lien, identifying it, and the amount of credit claimed and allowed upon the purchase price.

(c) In sales of real property the sheriff shall attach to the schedule a list of liens upon the property sold as certified from the record by the proper officers or a guaranteed search from any title company authorized to do business within the county. The cost of certifying the list of liens or the title search, the acknowledgment, recording and registry of the deed and transfer or documentary stamps shall be charged as an expense of distribution.

(d) The sheriff shall distribute the proceeds of sale in accordance with the proposed schedule of distribution, unless written exceptions are filed with the sheriff not later than ten (10) days after the filing of the proposed schedule.

(e) Upon the filing of exceptions, the sheriff shall transmit them to the prothonotary together with a copy of the proposed schedule of distribution.

(f) The court shall determine the exceptions, and for this purpose may receive evidence by deposition or otherwise, or may appoint an auditor to hear the evidence and report to the court.

(g) The proceeds of sale need not be paid into court by the sheriff but upon petition of the sheriff or any party in interest, the court may order the proceeds to be paid into court to await distribution or may order the sheriff to invest the fund for distribution pending final disposition of the exceptions or an appeal therefrom.

(h) If the sheriff receives any money for costs or in connection with a stay, adjournment or postponement of sale or otherwise, the sheriff shall account for it on returning the writ.

Once excess proceeds have been escheated to the State Treasurer, Section 1301.19 of DAUPA authorizes "[a]ny person claiming an interest in any property paid or delivered to the Commonwealth under this article may file a claim thereto or to the proceeds from the sale thereof on the form prescribed by the State Treasurer." 72 P.S. § 1301.19. Section 1301.20 of DAUPA provides:

> (a) The State Treasurer shall consider any claim filed under this article and may hold a hearing and receive evidence concerning it. If a hearing is held, the State Treasurer shall prepare a finding and a decision in writing on each claim filed, stating the substance of any evidence heard by the State Treasurer and the reasons for the State Treasurer's decision. The decision shall be a public record.
>
> (b) If the claim is allowed, the State Treasurer shall make payment forthwith.

72 P.S. § 1301.20. Section 1301.21 of DAUPA continues:

> (a) Any person aggrieved by a decision of the State Treasurer may appeal to the Commonwealth Court. The appeal shall be filed within thirty (30) days after the decision of the State Treasurer. The case shall be heard in Commonwealth Court's appellate jurisdiction.
>
> (b) Any person as to whose claim the State Treasurer has failed to take action within ninety (90) days after the filing of the claim may commence an action in the Commonwealth Court to establish his claim within one hundred twenty (120) days from the filing of the claim. The action shall be tried de novo without a jury.

72 P.S. § 1301.21.

In *Smolow v. Hafer*, 867 A.2d 767 (Pa. Cmwlth. 2005), this Court reiterated: "[W]here the Legislature has provided a specific statutory remedy, a class action may not be used to provide a different remedy." *Id.* at 773 (quoting *Aronson v. City of Pittsburgh*, 510 A.2d 871, 873 (Pa. Cmwlth. 1986)). As to unclaimed property, this Court specifically stated:

28

> [T]he mechanism for an aggrieved person to challenge an action of the [State] Treasurer under [DAUPA] is carefully set forth by the Legislature. That remedy . . . is personal to 'persons aggrieved' by a decision of the [State] Treasurer, and may not be transferred to others by way of a class action.
>
> Accordingly, this Court holds that **the right to claim unclaimed or abandoned property under [DAUPA] is individual, and it <u>must be pursued individually within the statutory confines of that legislation</u>**.

*Id.* at 774 (citations omitted; emphasis added). Moreover, the Explanatory Comment--1977 following Pa.R.C.P. No. 1702 specifically states: "[W]here a specific statutory remedy is provided for the processing of claims, numerosity of claims will not justify a class action. This follows the classic principle that a statutory form of relief must be followed exclusively." *Id.* (citation omitted).

Citing *Smolow*, the trial court in this case held that the statutory scheme represented by Pa.R.C.P. No. 3136 and DAUPA

> was enacted by the Legislature specifically to address situations such as those facing the [P]laintiffs. The system is designed to reunite prior owners of foreclosed homes with any excess proceeds due to them. There is no need for the prior owners to litigate their claims for such proceeds as a class before this [trial] court because each of them has the right to seek funds due him/her from the Sheriff and the trial court under the Pennsylvania Rules of Civil Procedure and from the [State] Treasurer and the Commonwealth Court under DAUPA.

Trial Ct. Op. at 5. The trial court also pointed out:

> The [State] Treasurer holds the funds received from the Sheriff in perpetuity, so claimants may come forward at any time in the future and obtain the full amount due to them. By contrast, a judgment rendered in this class action would have to be for a sum certain representing only the proceeds due to those few legitimate class members who came forward during the litigation, minus attorneys' fees and costs and possibly a premium for the named [P]laintiffs. If

29

> the former property owners apply to the [State] Treasurer for the amount due to them, no such fees are deducted [and, thus,] DAUPA provides a better means for identifying and paying potential class members . . . .

Trial Ct. Op. at 8.

Citing *Pentlong Corp. v. GLS Capital, Inc.*, 820 A.2d 1240 (Pa. 2003),[19] Plaintiffs argue that their equity-based classes should be permitted to proceed to provide tidy global resolution of this matter where until 2011 the Sheriff's Office and the City held and earned interest on the excess proceeds and then transferred tens of millions of dollars to the State Treasurer without complying with the Pa.R.C.P. No. 3136 distribution list filing requirement. In *Pentlong Corp.*, the Pennsylvania Supreme Court held:

> In most circumstances, where a legal remedy exists, a court is divested of equity jurisdiction. However, where the legal remedy cannot afford full, perfect and complete relief, equity extends its jurisdiction in the furtherance of justice. Thus, in order to determine whether equity jurisdiction is proper in the face of an existing legal or statutory remedy, we must determine if the legal remedy available to the plaintiff is adequate and complete. Where, for instance, a legal remedy would result in a multiplicity of duplicative lawsuits and, in contrast, an action in equity would provide a tidy global resolution, this Court has found the legal remedy to be inadequate.

*Pentlong Corp.*, 820 A.2d at 1245-46 (citations and quotation marks omitted).

Plaintiffs contend:

> In essence, DAUPA simply does not allow litigation of the mandamus or equity action, nor could it since the [State] Treasurer has no duties under Pa.R.C.P. [No.] 3135 [sic] – only the Sheriff does. . . . As such, DAUPA does not afford a full and complete remedy as to [sic] statutory scheme, to resolve some of the most important elements of

---

[19] *Pentlong Corp.* was superseded by statute on other grounds. *See* Section 3 of what is referred to as the Municipal Claims and Tax Lien Act, as amended by the Act of August 14, 2003, P.L. 83, No. 20, § 2, 53 P.S. § 7106.

[P]laintiffs['] case: mandamus and equity claims for unjust enrichment.

Plaintiffs' Br. at 33. The State Treasurer and the Sheriff's Office argue that *Pentlong Corp.* involved a class action in which the Supreme Court found that the statutory remedy at issue was not designed to address a novel legal challenge involving a municipality's assignment of liens to a private third party. However, here in contrast, there are no allegations that the Pa.R.C.P. No. 3136 and DAUPA remedies are similarly insufficient; thus, *Pentlong Corp.* is inapposite.

The Sheriff's Office further maintains that property owners do not have a substantive right to notice from the Sheriff's Office under Pa.R.C.P. No. 3136, but even if they did, they could allege procedural defects in their Pa.R.C.P. No. 3136 proceedings. The State Treasurer asserts that it and the Sheriff's Office have systems in place to return excess proceeds to property owners that are (now) being properly administered and, if Plaintiffs are successful in their quest to have the trial court issue an order mandating that the Sheriff's Office prepare distribution schedules for homes sold, such an order would apply to all future sales, not just theirs, so a class action is not a more fair, efficient or appropriate manner to obtain relief. We agree with the State Treasurer's position and hold that because Plaintiffs have not established that Pa.R.C.P. No. 3136 and DAUPA are inadequate to afford the putative class members full relief, the trial court did not abuse its discretion in applying Pa.R.C.P. No. 1708(a)(5) to determine that the trial court was not the appropriate forum to decide this case.

## IV.  CLASS CERTIFICATION PREREQUISITES

Next, Plaintiffs assert that the trial court abused its discretion in applying Pa.R.C.P. Nos. 1702, 1708 and 1709 to determine that the numerosity, typicality and adequacy of representation requirements were not met.[20]  We disagree.

> Pursuant to [Pa.R.C.P. No. 1702,[21]] the trial court may allow a representative to sue on behalf of a class if, the class

---

[20] Although in their Statement of Questions Involved, Plaintiffs referenced numerosity, typicality, adequacy of representation and fair and efficient method of adjudication, in its Summary of Argument and Argument, they refer only to numerosity, typicality and adequacy of representation.  *See* Plaintiffs' Br. at 5, 16, 34-37.  Their brief does not discuss the commonality prerequisite.

> Common questions of law and fact will generally exist if the class members' legal grievances are directly traceable to the same practice or course of conduct on the part of the class opponent.  The common question of fact [requirement] means precisely that the facts must be substantially the same so that proof as to one claimant would be proof as to all.  This is what gives the class action its legal viability.  While the existence of individual questions of fact is not necessarily fatal, it is essential that there be a *predominance* of common issues, shared by all the class members, which can be justly resolved in a single proceeding.

*Clark*, 990 A.2d at 24 (citations and quotation marks omitted).

[21] Pa.R.C.P. No. 1702 specifically states:

> One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

32

is numerous ('numerosity'); there are questions of law or fact common to the class ('commonality'); the claims of the representative are typical of the class ('typicality'); the representative will fairly and adequately protect the interests of the class ('adequate representation'); **and** a class action is a fair and efficient method for adjudicating the parties' controversy, under criteria set forth in Rule 1708.

*Samuel-Bassett*, 34 A.3d at 16 (emphasis added). "Rule 1702 . . . [is] written in the conjunctive, meaning that in order to obtain class action status, *all* prerequisites must be met." *Keppley v. Sch. Dist. of Twin Valley*, 866 A.2d 1165, 1176 (Pa. Cmwlth. 2005). The Pennsylvania Supreme Court has held:

> During certification proceedings, the proponent of the class bears the burden to establish that the Rule 1702 prerequisites were met. The burden is not heavy at the preliminary stage of the case. Indeed, evidence supporting a *prima facie* case will suffice unless the class opponent comes forward with contrary evidence; if there is an actual conflict on an essential fact, the proponent bears the risk of non-persuasion. It is essential that the proponent of the class establish requisite underlying facts sufficient to persuade the court that the Rule 1702 prerequisites were met.

*Samuel-Bassett*, 34 A.3d at 16 (citations and quotation marks omitted).

Here, the trial court denied Plaintiffs' class certification motion because Plaintiffs, *inter alia*, failed to satisfy the numerosity, typicality, representation adequacy, and fair and efficient adjudication method requirements for class certification.[22]

---

> (4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

> (5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

[22] Having already upheld the trial court's conclusion that the fair and efficient method of adjudication requirement was not satisfied because Pa.R.C.P. No. 3136 and DAUPA afford the

## Numerosity

"To satisfy this criterion, the class must be both numerous and identifiable, and '[w]hether the class is sufficiently numerous is not dependent upon any arbitrary limit, but upon the facts of each case.'" *Dunn*, 794 A.2d at 423 (quoting *Cook v. Highland Water and Sewer Auth.*, 530 A.2d 499, 503 (Pa. Cmwlth. 1987)). This Court has clarified: "A class is sufficiently numerous when 'the number of potential plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should plaintiffs sue individually.'" *Keppley*, 866 A.2d at 1171 (quoting *Baldassari v. Suburban Cable TV Co., Inc.*, 808 A.2d 184, 190 (Pa. Super. 2002)). "The proponent must not plead or prove the actual number of class members, **so long as [they are] able to define the class with some precision and provide the court with sufficient indicia that more members exists than it would be practicable to join**." *Id.* (emphasis added).

There are potentially thousands of putative class plaintiffs in this case. However, the trial court concluded that numerosity was not met because the classes are not well-defined. Expressly, the trial court opined:

> Both classes are defined temporally, but the time period that governs each is constantly shifting. Both definitions ask the court to count backwards from the date of judgment in this action, which is an unknown date in the future. As a result, membership in the classes depends upon how long this litigation continues . . . .
>
> Given the shifting class definitions and the potential length of this litigation, it is possible that people whose homes have not yet been foreclosed upon and sold at Sheriff's sale would fall within the time limits for the classes, whereas people who claim to be aggrieved now, such as the named

putative class members full relief, we will hereafter address only the numerosity, typicality and adequacy of representation requirements.

34

plaintiffs, would no longer qualify. Such future claimants obviously have not been victims of the Sheriff's former improper practices, so they are unlikely to qualify as class members even if they meet the temporal requirements of the class.

Trial Ct. Op. at 6 (footnotes omitted).

The trial court continued:

Even if it were possible to define the classes sufficiently, locating enough class members to make this class action meaningful would be too difficult and too costly. People who lose their homes, and thereby their mailing addresses, due to Sheriff's sales are necessarily forced to relocate, and they may not immediately obtain a new permanent address. In addition, many of the people whose homes were sold by the Sheriff disappeared, or died, long before foreclosure or tax proceedings even commenced. Locating them or their heirs is particularly difficult since their trails went cold ages ago.[FN]19 The normal means of finding and notifying class members, *i.e.*, by mailing notices to current addresses found in the defendant's files are unlikely to be successful in this case.

> FN.19 According to [P]laintiffs, from 2006 through 2009, the Sheriff sold over 8,900 properties from which it accumulated more than $7 million in excess proceeds. Complaint, ¶ 49. Assuming the number of sales each year would be roughly the same for the vaguely[-]defined class periods, the five[-]year Excess Proceeds Class would include more than 11,000 missing persons or their heirs, and the ten[-]year Interest Class would include more than 22,000.

Trial Ct. Op. at 7.

It is undisputed that there are more potential class members than are practicable to join in this litigation. We also acknowledge that Pa.R.C.P. No. 1710 authorizes the trial court to craft categories that would make the class manageable as follows:

(c) When appropriate, in certifying, refusing to certify or revoking a certification of a class action the court may order that

(1) the action be maintained as a class action limited to particular issues or forms of relief, or

(2) a class be divided into subclasses and each subclass treated as a class for purposes of certifying, refusing to certify or revoking a certification and that the provisions of these rules be applied accordingly.

(d) An order under this rule may be conditional and, before a decision on the merits, may be revoked, altered or amended by the court on its own motion or on the motion of any party. Any such supplemental order shall be accompanied by a memorandum of the reasons therefor.

*Id.* Nevertheless, since the classes cannot be defined with sufficient precision, and notification of property owners pursuant to Pa.R.C.P. No. 1712 would be difficult if, as the Sheriff's Office purports, the property owners' proceeds were not distributed because they could not be located by the Sheriff's Office or the State Treasurer, we hold that the trial court properly held that the numerosity requirement was not met.

## Typicality/Fair and Adequate Representation

Here, the trial court held that the typicality and adequacy of representation requirements were not satisfied. Relative to typicality, the Pennsylvania Supreme Court declared:

A challenge to the typicality requirement presumes that commonality has been established. The purpose of the typicality requirement is to ensure that the class representative's overall position on the common issues is sufficiently aligned with that of the absent class members to ensure that her pursuit of her own interests will advance those of the proposed class members. Typicality exists if the class representative's claims arise out of the same course of conduct and involve the same legal theories as those of other members of the putative class. The

36

requirement ensures that the legal theories of the representative and the class do not conflict, and that the interests of the absentee class members will be fairly represented. But, typicality does not require that the claims of the representative and the class be identical, and the requirement may be met despite the existence of factual distinctions between the claims of the named plaintiff and the claims of the proposed class.

*Samuel-Bassett*, 34 A.3d at 30-31 (citations and quotation marks omitted). As to fair and adequate representation, Pa.R.C.P. No. 1709 provides:

In determining whether the representative parties will fairly and adequately assert and protect the interests of the class, the court shall consider among other matters

(1) whether the attorney for the representative parties will adequately represent the interests of the class,

(2) whether the representative parties have a conflict of interest in the maintenance of the class action, and

(3) whether the representative parties have or can acquire adequate financial resources to assure that the interests of the class will not be harmed.

The trial court in this case reasoned that since Plaintiffs are real estate investors who are sometimes mortgage holders who cause homes to be sold at Sheriff's sales, sometimes property owners who make business decisions not to pay real estate taxes so the properties are sold at Sheriff's sales, and sometimes finders (for a fee) of people whose homes are sold at Sheriff's sales, they "are savvy speculators who understand and benefit from the lien and foreclosure processes currently in place[, and a]s such, they are not representative of a class of people who lost their homes due to their inability to pay real estate taxes and/or make timely mortgage payments."[23] Trial Ct. Op. at 9. The trial court also pointed out that "[i]f

---

[23] Although the Sheriff's Office and the State Treasurer claim that Plaintiffs' purported vendetta claims against the Sheriff's Office also make Plaintiffs atypical of the class they seek to represent, the trial court did not include that allegation in its reasoning.

judgment is not rendered in this action until January 2016, then neither of [the Plaintiffs] will still be a member of the Excess Funds Class at that time, and that class will have no representatives."[24] Trial Ct. Op. at 6 n.16.

"[I]t is . . . generally recognized that 'the mere fact that a representative plaintiff stands in a different factual posture is not sufficient to refuse certification . . . [t]he atypicality or conflict must be clear and must be such that the interests of the class are placed in significant jeopardy.' . . ." *Klusman v. Bucks Cnty. Court of Common Pleas*, 564 A.2d 526, 531 (Pa. Cmwlth. 1989) (quoting *Hedges Enters., Inc. v. Cont'l Grp., Inc.*, 81 F.R.D. 461, 465-66 (E.D.Pa. 1979)), *aff'd*, 574 A.2d 604 (Pa. 1990). Here, Plaintiffs' legal theories conflict with and place "in significant jeopardy" the interests of the property owners they purport to represent. *Klusman*, 564 A.2d at 531 (quoting *Hedges*, 81 F.R.D. at 466). If Plaintiffs were not entitled to

---

The Sheriff's Office and the State Treasurer also contend that Plaintiffs are not representative of the purported class because there is no record that they are due excess proceeds. The trial court did not find that assertion sufficiently compelling to deny class certification on that basis, merely stating in a footnote: "If the court determines that the Sheriff is correct and no excess funds are due [Plaintiffs], then they are not members of the classes they purport to represent." Trial Ct. Op. at 9 n.26.

[24] Certainly,

> [a] litigant must be a member of the class which he or she seeks to represent at the time the class is certified by the . . . court in order to ensure due process to the absent class members and to satisfy requirements of standing. [FN7]
>
> > FN7. Courts may, however, entertain a class action even if the representative's claim is rendered moot by the passage of time or an attempted separate settlement[.] If the original representative is decertified, courts may also keep the action pending to permit the remaining class members to seek another representative.

*Janicik v. Prudential Ins. Co. of Am.*, 451 A.2d 451, 458 (Pa. Super. 1982) (citations and quotation marks omitted). Thus, whether Plaintiffs eventually become ineligible to represent the class is not a sufficient basis upon which to deny class certification.

38

excess proceeds at the time class certification was sought, they are neither typical nor representative of the property owners they seek to represent. If Plaintiffs are entitled to excess proceeds, they have individual and business interests that are not representative of the other property owners, and this Court should not become the mechanism by which they are handed potential clients for whom they can collect excess proceeds for a fee. Accordingly, we hold that the trial court properly concluded that the typicality and representation adequacy requirements were not met.

Because the trial court has broad discretion to determine whether an action may be pursued on a class-wide basis, and here it considered the numerosity, typicality, representation adequacy, and fair and efficient method of adjudication requirements for class certification in detail, discerning no abuse of discretion, we affirm the trial court's order denying class certification on the basis that those requirements were not met.

## V. <u>COORDINATE JURISDICTION RULE</u>

Lastly, Plaintiffs argue that the trial court's order violated the rule of coordinate jurisdiction. Specifically, Plaintiffs assert that the trial court's holding that DAUPA is pre-emptive conflicts with a prior order of the same court holding just the opposite. We disagree. This Court has held:

> [The coordinate jurisdiction] rule is not absolute. Rather, [d]eparture from the rule is allowed in exceptional circumstances when there has been a change in the controlling law or where there was a substantial change in the facts or evidence.
>
> Moreover, the coordinate jurisdiction rule does not apply where the motions are of a different type.

*Hunter,* 80 A.3d at 536 (citation and quotation marks omitted).

The coordinate jurisdiction rule is not applicable to this case. In its November 14, 2011 order, the trial court (New, J.) denied the State Treasurer's

39

preliminary objections stating that DAUPA is not the exclusive remedy to recover excess proceeds because even if funds have been escheated, class members may proceed against the Sheriff's Office. *See* R.R. at 41a-46a. In its March 12, 2013 order, the trial court (Glazer, J.) denied the motion for class certification, in part, because DAUPA is the method by which individuals must obtain excess funds that have been escheated. Trial Ct. Op. at 4-5.

Rather than altering the resolution of the initial legal question, the March 12, 2013 order, like the November 14, 2011 order, stated that the property owners may seek excess proceeds from either the Sheriff's Office or the State Treasurer. Both orders acknowledge that Section 1301.14 of DAUPA authorizes the Sheriff's Office to pay excess funds to property owners even after they have been escheated to the State Treasurer as follows:

> Any holder who has paid moneys to the State Treasurer . . . may make payment to any person appearing to such holder to be entitled thereto. . . . Upon proof of such payment by a holder and proof that the payee was entitled thereto, the State Treasurer shall forthwith reimburse the holder for such payment together with interest from the date of receipt of such proofs by the State Treasurer to a date within thirty (30) days of the date of mailing of the reimbursement.

*Id.* In addition, because the motions underlying the trial court's November 14, 2011 order (based solely upon the sufficiency of the pleadings) and March 12, 2013 order (deciding class certification after discovery was conducted) were of different types, the rule of coordinate jurisdiction is inapposite. Thus, we hold that the trial court's order did not violate the rule of coordinate jurisdiction.

For all of the above reasons, the trial court's order is affirmed.

_____
ANNE E. COVEY, Judge

Judge Leadbetter did not participate in the decision in this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Sheriff's Excess             :
Proceeds Litigation                 :
                                    :
Appeal of: Joseph O'Hara and        :        No. 1246 C.D. 2013
Finn Land Corp.                     :


# O R D E R

AND NOW, this 31ˢᵗ day of July, 2014, the Philadelphia County Common Pleas Court's March 12, 2013 order is affirmed.

 

_____
ANNE E. COVEY, Judge